**UNITED STATES of America, Appellant,**

v.

**John Von BARTA, Defendant–Appellee.**

**No. 233, Docket 80–1233.**

United States Court of Appeals, Second Circuit.

Argued Oct. 27, 1980.

Decided Nov. 25, 1980.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City (Gerard E. Lynch, Gregory L. Diskant, Asst. U. S. Attys., New York City, of counsel), for appellant.

Elkan Abramowitz, New York City (Gilda I. Mariani, New York City, of counsel), for defendant ·appellee.

Before KAUFMAN, KEARSE and BRIGHT *, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The centuries·-long trend toward greater sophistication in the criminal law has increasingly blurred the line between criminal and noncriminal misbehavior. While defining lawless conduct is primarily a legislative function, courts have mitigated the severity of penal sanctions by construing ambiguous statutes against the Government. This doctrine of strict construction, which grew out of the emerging humanitarianism of seventeenth century England,[1] has long been a tenet of American jurisprudence. *See, e. g., United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 5 L.Ed. 37 (1820). But this principle is just the start of the difficult process of statutory interpretation, for in some areas Congress has purposely cast wide the net of the criminal law.

In the instant case, we are asked to construe two seemingly limitless provisions, the mail[2] and wire[3] fraud statutes, in the con-

---

* Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. Hall, *Strict or Liberal Construction of Penal Statutes*, 48 Harv.L.Rev. 748, 750 (1935).

2. 18 U.S.C. § 1341 (1976) provides *in pertinent part*:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more

text of the employer–employee relationship. The Government urges us to hold that these statutes are violated whenever an employee, acting to further a scheme for pecuniary gain, intentionally breaches a fiduciary duty of honesty or loyalty he owes his employer. The defendant decries this "overcriminalization" of the employment relationship, and asks us to declare his alleged conduct exempt from criminal sanction. While we reject the sweeping theory advanced by the Government, we find that the mail and wire fraud statutes do reach the conduct with which the defendant is charged. Accordingly, we reverse the district court's dismissal of the indictment.

## I.

A description of the procedural posture of this case is essential to our analysis of the merits of the Government's appeal. On November 1, 1979, John Von Barta was indicted on seven counts of mail fraud, seven counts of wire fraud, and one count of conspiracy to commit those offenses, in violation of 18 U.S.C. §§ 1341, 1343, 2, and 371 (1976). Von Barta moved to dismiss the indictment, contending it failed to charge a scheme or artifice to defraud, a necessary element of all fifteen counts. Judge Brieant initially denied Von Barta's motion, holding the indictment valid on its face. Upon reconsideration, however, he dismissed the charges. The Government then filed this appeal.

■ In reviewing the district court's dismissal of the indictment, we take as true all of its allegations, see Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16,

72 S.Ct. 329, 332 n.16, 96 L.Ed. 367 (1952); United States v. Bohonus, 628 F.2d 1167 (9th Cir. 1980), as amplified by additional documents submitted by the Government, which Judge Brieant accepted in lieu of a formal bill of particulars. The defendant's contrary assertions of fact will not be considered. See Las Vegas Merchant Plumbers Association v. United States, 210 F.2d 732, 741 (9th Cir.), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954).

From 1976, until the indictment against him was filed in 1979, Von Barta was employed as a salesman and trader of government bonds at Malon S. Andrus, Inc. ("Andrus"), a small securities firm in New York City. When Von Barta was hired, he was admonished "never to jeopardize the firm's banking relationships and always to advise Mr. Andrus if the firm's repurchase agreements 'were in trouble.'"[4] As this warning indicates, Von Barta enjoyed an especially powerful and trusted position at Andrus. He had considerable discretion to open new customer accounts, knowing his decisions in that regard would not be re–examined by another member of the firm.

Von Barta conducted many of his trades with William Harty,[5] a salesman in the government securities department at Blyth Eastman Dillon & Co. ("Blyth"), a large New York brokerage firm. In or about July 1978, Harty formed the Piwacket Corp. ("Piwacket"), to which he and Von Barta each contributed $5,000 as their capital investment. They decided to use Piwacket as their vehicle for trading in government bonds, and agreed to share equally in any profits made by their corporation. Von

than $1,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 1343 (1976) provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not

more than $1,000 or imprisoned not more than five years, or both.

4. Letter dated February 7, 1980 from Assistant United States Attorney Kaplan to Elkan Abramowitz, counsel for the defendant. Judge Brieant treated this letter as a bill of particulars.

5. Harty was named in the indictment returned against Von Barta as an unindicted "co–schemer." He was also charged in an information similar to the indictment filed against Von Barta, and pled guilty to those charges.

Barta then opened an account for Piwacket with Andrus, without telling Mr. Andrus of Piwacket's meagre capitalization or of his involvement with the firm. Piwacket became one of Andrus's most active accounts, generating substantial commissions for both Andrus and Von Barta. Piwacket ultimately speculated in government bonds worth more than $50 million, and incurred liabilities vastly in excess of the combined ability of Andrus and Piwacket to secure Piwacket's creditors against loss. The volume of Piwacket's trading attracted the attention of Andrus and Blyth, but Von Barta continued to conceal his involvement, falsely telling Mr. Andrus that Piwacket was an established Long Island arbitrageur and misrepresenting to Blyth that Harty was Piwacket's sole principal.

At first, Piwacket's trades were very successful, generating profits of nearly $200,000. Later, however, the bond market weakened. When Von Barta indicated that Piwacket could not cover its losses, Andrus terminated the Piwacket account. Piwacket's resultant insolvency forced Andrus and Blyth to bear a $2 million loss.

The Government alleges that by trading through Piwacket, Von Barta speculated in the government bond market using the fraudulently obtained credit of Blyth and Andrus. It charges further that by limiting Piwacket's liability to $10,000 (the amount of the capital investment), Von Barta attempted to shield himself from the risk accompanying his speculative transactions. In effect, the Government claims, Von Barta shifted the risk from himself to Andrus.

If his trades were successful, he reaped the profit; if they failed, Andrus bore the loss. Finally, the Government charges that Von Barta concealed material information from Andrus. According to the Government, Andrus never would have allowed Von Barta to open or to continue trading in the Piwacket account had it known Piwacket was undercapitalized, that Von Barta was involved with the firm, or that neither Andrus nor Piwacket had sufficient assets to cover Piwacket's losses.

In setting out its theory of the indictment, the Government has repeatedly refused to rely on allegations that Von Barta intended to defraud Andrus of any tangible interest. Rather, the Government charges that "Von Barta, by abusing his fiduciary position as an employee of Andrus, and concealing material information, defrauded Andrus of its right to his honest and faithful services, as well as of its right to decide what business risks to bear with all the facts before it."[6] Thus, we are asked to decide whether Von Barta's alleged scheme to defraud his employer of only these intangible interests violates the mail and wire fraud statutes.[7]

## II.

As an initial matter, we must consider Von Barta's challenge to our jurisdiction to hear this case, a question that arises because the district court adopted an unusual procedure in construing the indictment.[8] Von Barta contends that an appeal

---

6. Government's brief at 5.

7. We note that Von Barta strenuously disputes the Government's characterization of the facts. In particular, he claims he was not speculating in the government bond market, that there was nothing unusual about employees at Andrus trading on their own accounts, and that the details of Piwacket's financial position and the volume of its trading were not material to Andrus. Of course, our exegesis of the mail and wire fraud statutes is tied to the Government's allegations. We express no opinion concerning the proper application of those provisions to the factual setting Von Barta describes.

8. As previously discussed, Judge Brieant initially denied Von Barta's motion to dismiss, holding that the defendant could be convicted under the indictment "[i]f proof at trial shows that defendant, alone or with Harty, intentionally induced Blyth or Andrus to part with money or tangible property, . . . and did so by means of active concealment or false statements in furtherance of a scheme or artifice to defraud, within the statute, and some pecuniary loss to the firms or pecuniary gain to Harty or defendant was sought or intended thereby." *United States v. Von Barta*, No. 79 Cr. 774, slip op. at 9 (S.D.N.Y. Apr. 21, 1980). In so holding, Judge Brieant considered the indictment on its face "as amplified and limited by letters from the Government, oral representations made in open court, and silence or partial silence of the Government in response to defendant's submis-

does not lie because, he says the Double Jeopardy Clause bars his further prosecution. Relying on *Finch v. United States,* 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977) (per curiam), he argues that since Judge Brieant went beyond the face of the indictment in granting the motion to dismiss, the order of dismissal constitutes a nonappealable acquittal. The Government disputes Von Barta's characterization of the district court's order and asserts jurisdiction under 18 U.S.C. § 3731 (1976).

■ Section 3731 provides, in relevant part:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

The provisions of this section, which are to be liberally construed, are designed to "remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *United States v. Wilson,* 420 U.S. 332, 337, 95 S.Ct. 1013, 1018, 43 L.Ed.2d 232 (1975). Section 3731 thus abrogates the strict rules which once practically barred all criminal appeals by the United States and directs our attention to the policies underlying the Double Jeopardy Clause. In particular, we must decide whether jeopardy had attached when Judge Brieant dismissed Von Barta's indictment, for it is a "fundamental principle that an accused must suffer jeopardy before he can suffer double jeopardy." *Serfass v. United States,* 420 U.S. 377, 393, 95 S.Ct. 1055, 1065, 43 L.Ed.2d 265 (1975). *See also United States v. Jorn,* 400 U.S. 470, 480, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). In *United States v. Velazquez,* 490 F.2d 29 (2d Cir. 1973), *cert. denied,* 421 U.S. 946, 95 S.Ct. 1675, 44 L.Ed.2d 99 (1975), one of the first cases in this Circuit to consider this question, we held that jeopardy had not attached when the district court, relying on motion papers submitted prior to trial, dismissed an indictment. In *Serfass v. United States,* however, the Supreme Court rejected *Velazquez's* premise that the normal rules governing the attachment of jeopardy are only presumptions.[9] While eschewing a mechanical approach, the Court stated that jeopardy does not attach until the accused has been forced to risk a determination of guilt. *Id.* 420 U.S. at 391–92, 95 S.Ct. at 1064. Consequently, the Court upheld the Government's right to appeal the dismissal of Serfass's indictment, although the district judge had found facts before ruling on the motion to dismiss.

■ In this case, Judge Brieant did not resolve any disputed issues of fact in granting Von Barta's motion to dismiss the indictment. He simply used the materials available to him to shed light on the Government's theory of the case. Moreover, since Judge Brieant had no power to convict Von Barta at this preliminary stage of the proceedings, the defendant has not yet risked a determination of guilt. Accordingly, the Double Jeopardy Clause does not bar further prosecution, and the Government's appeal under § 3731 is proper.[10]

---

sions." *Id.* at 6. He emphasized, however, that no proof had been taken.

Realizing that Judge Brieant had misunderstood its theory of indictment, the Government moved for reargument. Once properly apprised of the Government's "intangible interest" theory, Judge Brieant granted Von Barta's motion to dismiss.

This recitation of the proceedings in the lower court suffices to refute the defendant's claim that the Government is estopped to appeal from the order of dismissal. Contrary to Von Barta's assertion, Judge Brieant did not grant the Government's motion, he granted Von Barta's.

9. In a jury trial, jeopardy usually attaches when the jury is empanelled and sworn, *Serfass v. United States,* 420 U.S. 377, 388, 95 S.Ct. 1055, 1062, 43 L.Ed.2d 265 (1975), but in a trial to the court, jeopardy normally attaches when the court begins to hear evidence, *id.*

10. *Finch v. United States,* 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977) (per curiam), on which Von Barta relies, does not compel a different result. Because Finch was

### III.

We now turn to the merits of the Government's argument. The prosecution contends that the phrase "scheme or artifice to defraud," which appears in both the mail and wire fraud statutes,[11] encompasses a fraudulent scheme to deprive an employer of his intangible right to an employee's honest and faithful services. Before attempting to determine the proper scope of these statutes, however, we note that the courts have taken conflicting approaches to their interpretation. Many have construed the mail fraud statute expansively.[12] Others, voicing the concerns underlying the doctrine of strict construction, have taken a narrower view.[13] Several courts have attempted to reconcile these disparate approaches by seeking to discover how far Congress meant to extend § 1341 and by strictly confining the statute within its intended bounds. *See United States v. Bohonus, supra; United States v. McNeive*, 536 F.2d 1245, 1247 n.3 (8th Cir. 1976). This attempted accommodation is unavailing,

however. The sparse legislative history accompanying § 1341 and its predecessor statutes reveals only one clearly articulated purpose: to prevent the use of the mails in furtherance of fraudulent enterprises. *See United States v. Mandel*, 591 F.2d 1347, 1358 (4th Cir.), *aff'd per curiam in relevant part*, 602 F.2d 653 (1979) (en banc), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *Badders v. United States*, 240 U.S. 391, 393, 36 S.Ct. 367, 367, 60 L.Ed. 706 (1916) (interpreting predecessor statute); *Durland v. United States*, 161 U.S. 306, 314, 16 S.Ct. 508, 511, 40 L.Ed.2d 709 (1896) (interpreting predecessor statute). Unfortunately, this purpose affords us little help in defining "scheme or artifice to defraud."

The absence of legislative guidance has left the courts with broad discretion to apply the mail fraud statute to the myriad fraudulent schemes devised by unscrupulous entrepreneurs. This process of case by-case development has produced several limiting principles.[14] But not all the

---

charged with a petty offense, he had no constitutional right to a jury trial. He was thus placed in jeopardy when the court began to hear evidence, *see* note 9 *supra*, which occurred *before* the information filed against him was dismissed.

**11.** Since the courts have uniformly given this language the same construction in applying both the mail and wire fraud statutes, *see, e. g., United States v. Louderman*, 576 F.2d 1383, 1387 n.3 (9th Cir.), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978), we will refer only to the mail fraud statute in the following discussion.

**12.** An oft-quoted formulation is that found in *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958): "The aspect of the scheme to 'defraud' is measured by [a] nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general business life of members of society." *Accord, United States v. States*, 488 F.2d 761, 764 (8th Cir. 1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 and 417 U.S. 950, 94 S.Ct. 3078, 41 L.Ed.2d 671 (1974); *United States v. Buckner*, 108 F.2d 921, 926 (2d Cir.), *cert. denied*, 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940).

**13.** For example, in applying § 1341 in the field of domestic relations, the Fifth Circuit stated: "Statutes like the federal mail fraud statute

involved here must be strictly construed in order to avoid extension beyond the limits intended by Congress." *United States v. Edwards*, 458 F.2d 875, 880 (5th Cir.), *cert. denied*, 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972). *Accord, United States v. Louderman, supra*, 576 F.2d at 1388; *United States v. Kelem*, 416 F.2d 346, 347 (9th Cir. 1969), *cert. denied*, 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970).

**14.** Thus, to make out a mail fraud violation, the Government must show that the scheme was devised with the specific intent to defraud, *e. g., United States v. Keane*, 552 F.2d 534, 544 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). This specific intent requirement is sometimes used to distinguish actual and constructive fraud. Actual frauds are intentional frauds. Constructive frauds involve breaches of fiduciary or equitable duties where an intent to deceive is lacking. *See Epstein v. United States*, 174 F.2d 754, 765–66 (6th Cir. 1949). Only actual frauds are within the purview of the mail fraud statute. *Post v. United States*, 407 F.2d 319, 329 & n.58 (D.C.Cir. 1968), *cert. denied*, 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969); *Epstein v. United States, supra*.

To prove mail fraud, the prosecution must also demonstrate that the use of the mails in furtherance of the scheme was reasonably foreseeable, *e. g., Pereira v. United States*, 347 U.S.

rules the courts have fashioned narrow the statute's scope. For example, it is now generally accepted that the object of the fraudulent scheme need not be the deprivation of a tangible interest. Artifices designed to cause losses of an intangible nature also violate the statute. *See e. g., United States v. Bohonus, supra* (loss of right to honest services); *United States v. Condolon*, 600 F.2d 7, 9 (4th Cir. 1979) (loss of time, effort, and expectations); *United States v. Louderman*, 576 F.2d 1383 (9th Cir.), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978) (deprivation of right to privacy). These precedents aid us to focus our inquiry. Recognizing that § 1341 reaches some schemes causing intangible loss, we must determine whether "mail fraud" encompasses all fraudulent schemes involving an employer's deprivation of his right to his employee's loyal and honest services.

Despite the broad language contained in some opinions, *see e. g., United States v. Condolon, supra*, several courts have held that the breach of an employee's fiduciary duty, without more, does not violate the mail fraud statute. *See United States v. Mandel, supra*, 591 F.2d at 1362; *United States v. McDonald*, 576 F.2d 1350, 1359 n.14 (9th Cir.), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 and 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978); *United States v. Bush*, 522 F.2d 641, 648 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). The additional element which frequently transforms a mere fiduciary breach into a criminal offense is a violation of the employee's duty to disclose material information to his employer. In *United States v. Bush*, for example, Mayor Daley's former press secretary was prosecuted for concealing his interest in a firm that held the exclusive rights to prepare advertising displays at Chicago O'Hare International Airport. In affirming Bush's mail fraud conviction, the Seventh Circuit noted he had breached his fiduciary duty to render honest and faithful services to the Mayor and citizens of Chicago. But this breach alone, the Court reasoned, could never be considered a mail fraud violation. "It is only when [Bush's] failure to provide honest and faithful services is combined with his material misrepresentations to the mayor ... and his active concealment that an illegal fraud occurs which is cognizable under § 1341." 522 F.2d at 648.

Similarly, in *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), the Eighth Circuit reversed the mail fraud conviction of a state legislator who aided an architectural firm in obtaining state contracts. Rabbitt's reward for his services was a commission of ten percent based on the work he diverted to the firm. Although Rabbitt violated the canons of legal ethics, a statute requiring candidates for state office to disclose their sources of income, and possibly a state provision outlawing "partiality" or abuse of public office, his unscrupulous conduct was held not to violate § 1341. Significantly, one reason for the court's refusal to impose criminal liability was that Rabbitt, as a state official, was under no affirmative duty to disclose his interest in the firm.[15]

1, 8–9, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Furthermore, the deceit must have gone to the nature of the bargain, *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970); that is, any nondisclosures or affirmative misrepresentations must have been material, *see, e. g., United States v. Bush*, 522 F.2d 641, 647–48 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *United States v. Bryza*, 522 F.2d 414, 425–26 (7th Cir. 1975), *cert. denied*, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). And although the Government need not show that the scheme's victims were in fact defrauded, *United States v. Andreadis*, 366 F.2d 423, 431 (2d

Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967), the prosecution must prove that some actual harm or injury was at least contemplated, *United States v. Dixon*, 536 F.2d 1388, 1399 n.11 (2d Cir. 1976); *United States v. Regent Office Supply Co., supra*, 421 F.2d at 1180.

**15.** *Accord, United States v. Groves*, 122 F.2d 87, 90 (2d Cir.), *cert. denied*, 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941) (breach of corporate insider's positive duty to speak is violation of mail fraud statute). *See also United States v. Brown*, 540 F.2d 364, 374–75 (8th Cir. 1976); *United States v. Bryza, supra*, 522 F.2d at 425–26.

■ Our discussion is not to be construed as holding that an employee's duty to disclose material information to his employer must be imposed by state or federal statute. Indeed, the employment relationship, by itself, may oblige an employee not to conceal, and in fact to reveal, information he has reason to believe is material to the conduct of his employer's business. *See United States v. Brown*, 540 F.2d 364 (8th Cir. 1976); *United States v. Groves*, 122 F.2d 87 (2d Cir.), *cert. denied*, 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941).

■ In light of these precedents, and taking the facts as alleged by the Government, we have no difficulty holding that Von Barta was under a duty to apprise Andrus of material information concerning Piwacket's trading in government bonds. Von Barta was admonished to warn Mr. Andrus if the firm's repurchase agreements "were in trouble." But he said nothing upon opening an account for an allegedly undercapitalized firm, knowing, as an experienced trader for Andrus, that if Piwacket became insolvent, Andrus would be liable for any losses. Nor can we overlook the fact that by trading in millions of dollars, Von Barta exposed Andrus to liabilities greatly in excess of Andrus's limited ability to meet them. When Mr. Andrus became concerned, however, and inquired about Piwacket, Von Barta dissimulated, telling his employer that Piwacket was backed by credit worthy arbitrageurs from Long Island. Von Barta's alleged scheme to speculate in the bond market using Andrus's credit was eminently successful. At first, Von Barta pocketed nearly $100,000 from Piwacket's trades, but when the market collapsed, Andrus was left with nothing but a responsibility for heavy debts.

The Government's charges reveal that Von Barta's relationship with Andus was special in several respects. Von Barta was advised to keep his employer informed of adverse market developments, and he occupied a position of great trust and considerable power, apparently possessing the authority to extend his employer's credit beyond Andrus's capacity to cover losses. These special circumstances are the source of Von Barta's duty of disclosure. Thus, we need not decide whether all employees risk prosecution for mail fraud if they fail to reveal material information to their employers. Nor must we express any opinion as to what constitutes material information. We simply hold that on the facts alleged by the Government, Von Barta's breach of his duty of disclosure subjects him to prosecution for mail fraud.

Accordingly, we reverse the district court's order dismissing the indictment, and remand for further proceedings not inconsistent with this opinion.