**Brian INGBER, Petitioner,**

v.

**Lee ENZOR, Superintendent, FCI Danbury, Respondent.**

No. 87 Civ. 4693–CLB.

United States District Court,
S.D. New York.

July 15, 1987.

Elkan Abramowitz, Todd Krouner, Obermaier, Morvillo, Abramowitz & Iason, New York City, for petitioner.

Michael Chertoff, Sp. Asst. U.S. Atty., Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., New York City, for respondent.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

The Supreme Court decision in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), requires that this Court reconsider, on this petition brought under 28 U.S.C. § 2255, the mail fraud convictions of Brian Ingber on Counts Five and Nine of the Indictment in this case. In *McNally*, the Supreme Court, after a decade of denials of certiorari in many cases decided to the contrary, finally gave explicit recognition to the fact that the mail fraud statute, 18 U.S.C. § 1341, is limited in scope to the protection of money or tangible property, and "does not refer to the intangible right of the citizenry to good government." —— U.S. at ——, 107 S.Ct. at 2879.

On January 16, 1986, after a jury trial, Brian Ingber was convicted of violating the mail fraud statute in connection with his election to the office of Supervisor of the Town of Fallsburg, Sullivan County, New York. Charged in the Indictment as Count Nine, the election fraud scheme had been severed from the remaining counts in the Indictment charging fraud in the procurement and administration of a public works contract. These counts were tried separately to the Court and, on June 18, 1986, Ingber was convicted on Count Five, mail fraud arising out of the delivery of an authorization to award a sewer contract, and on Count Ten, false statements made in an attempt to cover up, during the subsequent investigation, Ingber's involvement in the sewer contract fraud. Familiarity of the reader with the Court's findings and supplemental findings as to these counts is assumed. *See* Findings and Conclusions, June 18, 1986; Memorandum and Order, July 22, 1986.

The Court of Appeals has affirmed all three convictions in an unpublished memorandum opinion dated February 4, 1987, No. 86–1402.

*Count Nine*

We are concerned here primarily with Count Nine of the Indictment, which charged, *inter alia*, that Brian Ingber defrauded the citizens of Fallsburg "of their ballots and of their rights to a fair and impartial electoral process," essentially by falsifying voting documents, including voter registration forms, applications for absentee ballots, and absentee ballots which were then cast in Ingber's favor and tabulated by the Sullivan County Board of Elections. The Indictment also charged Ingber with obtaining the "salary, powers and privileges" of the office of Supervisor by means of "false and fraudulent absentee ballot applications, ballot envelopes, and ballots." This conduct violated state election law and could have been prosecuted in the New York courts as a "class E" felony carrying a maximum penalty of four years, as contrasted with federal mail fraud carrying a maximum penalty of five years. *See* N.Y. Election Law § 17–132 (McKinney's 1978).

The prosecution proceeded on the theory that Ingber's participation in the ballot fraud deprived the citizens of Fallsburg of their intangible right to a fair election with results free from dilution by intentionally cast false ballots, and also deprived the citizens of their own right to vote. Ingber's receipt by mail of his Certificate of Election from the Sullivan County Board of Elections was alleged as the requisite predicate mailing under § 1341.

Ingber appealed the conviction on Count Nine on the ground that the prosecution relied on insufficient proof of use of the mails. Rejecting this argument, the Court of Appeals stated in its unpublished affirmance of the conviction,

"[t]he mailing of the certificate of election was not, as Ingber posits, merely a

confirmation of the vote count. Under New York law, a county canvassing board decides which individuals have been elected, and, based upon that determination, the board of election transmits a certification 'naming the office to which such canvassing board has declared him elected.' N.Y.Elec.Law. § 9–212 (McKinney's Supp.1987), whereupon the certificate constitutes *prima facie* proof of the validity of the recipient's election.... Ingber had not achieved the very objective of the scheme—the right to exercise the powers of Town Supervisor—until he was informed of his victory by the certificate of election. Thus, the mailing was in furtherance of the scheme to defraud and Ingber was properly convicted on count 9 of the indictment."

At trial, this Court was constrained by a line of decisions from our Court of Appeals holding that schemes to defraud citizens of their intangible rights to honest and impartial government, and similar breaches of fiduciary duty in the private sector, will sustain a mail fraud prosecution. *See, e.g., United States v. Von Barta,* 635 F.2d 999, 1006 (2d Cir.1980), *cert. denied* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *United States v. Bronston,* 658 F.2d 920, 926 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *United States v. Margiotta,* 688 F.2d 108, 121 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

This interpretation of the mail fraud statute now has been soundly rejected. The Supreme Court will no longer allow the lower courts to "extend the wide mouthed purse seine of 'mail fraud' to include mere breaches of a fiduciary duty of honesty and loyalty." *United States v. Von Barta,* No. 79 Cr. 774–CLB, slip op. (S.D.N.Y. April 21, 1980), *rev'd on this ground,* 635 F.2d 999.

Beginning in 1980 with *United States v. Von Barta,* our Court of Appeals, with the tacit acquiescence of the Supreme Court, read into the mail fraud statute a prohibition of a scheme by an employee to defraud an employer of its right to his honest and faithful services. The scheme in Von Barta's case was both simple and traditional. Defendant, a salesman and trader employed by a securities firm, colluded with an employee of another such firm to establish an undercapitalized vehicle in order to make vast overnight speculative trades in government securities. In a form of whimsy seldom found among swindlers, they named the trading vehicle Piwacket Corporation (from Pyewacket, the black cat in John Van Druten's 1951 play *Bell, Book and Candle* ). They concealed their ownership of Piwacket from their respective employers, and Von Barta falsely told his employer that Piwacket was controlled by "established Long Island arbitrageurs." Confirmations of securities transactions passed through the mails.

Treating as "precedents" cases decided by the Fourth and Ninth Circuit Courts of Appeals, our Court of Appeals in *Von Barta* held that "[a]rtifices designed to cause losses of an intangible nature also violate the [mail fraud and wire] statute[s]." 635 F.2d at 1006, citing *United States v. Bohonus,* 628 F.2d 1167 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *United States v. Condolon,* 600 F.2d 7 (4th Cir.1979); *United States v. Louderman,* 576 F.2d 1383 (9th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978). The court also cited with approval *United States v. Bush,* 522 F.2d 641, 648 (7th Cir.1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976), in which a city employee was prosecuted for concealing his interest in a firm that held the exclusive rights to prepare advertising displays for the city's major airport, and *United States v. States,* 488 F.2d 761 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974), in which political candidates were prosecuted for using fraudulent voter registrations and applications for absentee ballots to influence the outcome of their elections.[1]

---

**1.** Ultimately, Von Barta was not convicted of any crime. On remand, the government conceded that there was insufficient credible evidence to support the allegations. Arguably, Von Barta and his co-schemer, William Harty, were in fact "established Long Island arbitrageurs."

Common to these cases is an employee's or public official's breach of a fiduciary duty to his employer or the public at large. The "additional element" transforming "a mere fiduciary breach into a criminal offense is a violation of the employee's duty to disclose material information to his employer." *Von Barta,* 635 F.2d at 1005 n. 14, 1006. *See also United States v. Newman,* 664 F.2d 12 (2d Cir.1981) (employees of investment bank said to have breached duty to inform employer of their own insider-trading activities related to clients' impending mergers and acquisitions), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983); *United States v. Weiss,* 752 F.2d 777 (2d Cir.) (corporate officer prosecuted for concealing diversion of corporate funds to unknown presumably political purposes), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985).

Secure in the knowledge that the Supreme Court had repeatedly declined to review such expansive and unfounded constructions of the mail fraud statute, the Second Circuit continued its descent down this slippery slope. Affirming the conviction in *United States v. Bronston,* 658 F.2d 920 (2nd Circ.1981) the court extended its *Von Barta* holding to permit the mail fraud prosecution of a lawyer, also a state legislator, who allegedly breached his duty of undivided loyalty to a client of his law firm, by concealing his promotion, for a fee, of the efforts of a competitor of that client in obtaining a city bus stop shelter franchise. Although the lawyer did not personally represent the firm's client, and had no access to any confidential information regarding that client's bus stop shelter bid, his letter writing on legislative letterhead and negotiations on behalf of the competitor, which violated his ethical duty as a lawyer to avoid or disclose conflicts of interest, sufficed to invoke the mail fraud statute. In a development that compares to the current distention of the insider trading laws, the court held that "proof that the fiduciary relationship was used or manipulated in some way is not necessary." *Id.* at 926. *See also United States v. Carpenter,* 791 F.2d 1024 (2d Cir.), *cert. granted,* —— U.S. ——, 107 S.Ct. 666, 93 L.Ed.2d 718 (1986) (*Wall Street Journal* reporter prosecuted for concealing from his employer scheme in which he disclosed contents of influential securities news column in advance of publication to friends who traded on the information).

Our Court of Appeals took the final step down the slippery slope in *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), in which the majority of a panel affirmed the mail fraud conviction of a political party leader, prosecuted for breaching a fiduciary duty to the public by concealing an arrangement to share commissions with a municipality's insurance broker. Although Margiotta did not hold public office, he was deemed a public fiduciary as a result of others' reliance on him "because of a special relationship in the government" and as a result of his participation in governmental decisions. *Id.* at 127. That neither the state nor municipality required political party leaders to act in a disinterested fashion or to disclose such arrangements was held immaterial to the development under the mail fraud statute of the majority's theory of fiduciary responsibility.

While the majority in *Margiotta* expressed concern that "§ 1341 is seemingly limitless on its face," and acknowledged the so-called rule of lenity in construing ambiguous criminal statutes, it nonetheless held that the mail fraud statute's prohibition against schemes or artifices "to defraud" was not limited by the statute's explanatory language "for obtaining money or property." *Id.* at 120, 121. Because Margiotta's failure to disclose his arrangement with the insurance broker supposedly deprived the "general citizenry" of "intangible and abstract political and civil rights," his conviction "effectuated the statute's fundamental purpose in prohibiting the misuse of the mails to further fraudulent enterprises of all kinds." *Id.* at 121. The majority rejected Margiotta's contentions that its interpretation of § 1341 was impermissibly vague and impaired First Amendment rights of expression, association and petition by chilling the activities of political parties and lobbyists.

In a thoughtful dissent in *Margiotta,* Judge Winter criticized "[t]he majority's use of mail fraud as a catch-all prohibition of political disingenuousness [which] expands that legislation beyond any colorable claim of Congressional intent and creates a real danger of prosecutorial abuse for partisan political purposes." 688 F.2d at 139 (Winter, J., dissenting). The Court of Appeals refused *en banc* consideration for *Margiotta,* and as noted earlier, certiorari was denied.

Having criminalized employees' breaches of loyalty, and subjected public officials, candidates and party leaders to prosecution for allegedly deceptive political speech, it was a small next step for the Court of Appeals to read the mail and wire fraud statutes to impose fiduciary obligations on corporate directors and officers and to regulate intracorporate affairs. In *United States v. Siegel,* 717 F.2d 9 (2d Cir.1983), the majority of a panel affirmed the wire fraud conviction of corporate officers who, by keeping improper records and diverting corporate funds into a "slush fund," breached their fiduciary duty to act in the best interest of the corporation and to disclose material information to the corporation and its shareholders. Although the government's posture in *Siegel* was rife with innuendo of other crimes, including embezzlement, bribery, and securities fraud, the government proceeded on a wire fraud theory apparently because it lacked jurisdiction to bring the underlying charges. The majority sanctioned such indirect enlargement of jurisdiction by allowing prosecution on the theory that the corporation and its shareholders were defrauded of their intangible right to honest and forthcoming management.

Troubled by the *Siegel* majority's endorsement of an "expandable" and "elastic" body of criminal law, Judge Winter again dissented, maintaining that the fiduciary duties of corporate officers should be developed and applied on a case by case basis in state courts. 717 F.2d at 23 (Winter, J., dissenting). Judge Winter objected to the creation of a "catch-all federal common law crime" under "the pretense of merely discharging Congress' will." As in his *Margiotta* dissent, he anticipated abuses of prosecutorial discretion, and criticized the majority's legal theory as providing inadequate notice of criminality: "even the wisest counsel cannot foresee what corporate acts may after the fact attract a prosecutor's suspicion (or ire) and a judicial stamp of impropriety." 717 F.2d at 24.

Judge Miner, who was not a member of the Court of Appeals when either *Margiotta* or *Siegel* was decided, later observed in a speech on September 18, 1986, before the New York Federalist Society:

"Originally designed to prevent the misuse of the postal system, the mail fraud statute has evolved by judicial interpretation into a vehicle for the prosecution of an almost unlimited number of offenses bearing very little connection to the mails, which would ordinarily be prosecuted in the state courts."

Miner, "Federal Courts, Federal Crimes, and Federalism," published in *Harvard Journal of Law & Public Policy* 117, 121 (1987).

It should be noted that the judicial excesses criticized above were not confined to our Court of Appeals. *See United States v. Condolon,* 600 F.2d 7 (4th Cir.1979) (defendant found guilty of wire fraud for using a telephone in connection with his operation of a bogus talent agency which he established to meet and seduce young women); *United States v. Keane,* 522 F.2d 534 (7th Cir.1975) ("The statute includes a broad proscription of behavior for the purpose of protecting society"), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *Post v. United States,* 407 F.2d 319 (D.C.Cir.1968) ("promoters of stock corporations who employ the mails in deceitful violation of their fiduciary obligations may incur the full condemnation of the law"), *cert. denied,* 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969). Yet it was not until long after most of the unsuccessful appellants mentioned above had served their sentences that the Supreme Court in *McNally v. United States* finally placed alleged breaches of fiduciary duty and violations of intangible rights beyond the reach of the mail fraud statute.

In *McNally,* a public official of the Commonwealth of Kentucky and a private individual were convicted for their participation in a self-dealing patronage scheme in which they used their political influence to direct governmental insurance business to companies in which they held undisclosed interests. The trial court's instructions did not require the jury to find that the Commonwealth itself was defrauded of any money or property in order to find a scheme to defraud the citizens of Kentucky. Rather, it was sufficient under the trial court's instructions for the jury to find that the defendants concealed the conflicts of interest inherent in the scheme, thus depriving the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly. The Supreme Court reversed the mail fraud convictions, holding that this instruction "permitted a conviction for conduct not within the reach of section 1341."

> Section 1341 provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so uses the mails or causes them to be used, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

A review of the sparse legislative history of the mail fraud statute prompted the observation in *McNally* that the "original impetus" behind it, as enacted in 1872, was "to protect the people from schemes to deprive them of their money or property." —— U.S. at ——, 107 S.Ct. at 2879. The Supreme Court drew this conclusion in part from the remarks of the statute's sponsor, Representative Farnsworth, Republican of Illinois, during debates in the House. Those remarks, quoted here in greater detail than the bowdlerized version used in the Supreme Court opinion in *McNally,* described the anti-fraud provision of the mail fraud statute as a measure

> "to prevent the frauds which are mostly gotten up in the large cities of New York and Philadelphia, chiefly in New York, by thieves, forgers, and rapscallions generally, for the purpose of deceiving and fleecing the innocent people in the country."

Representative Farnsworth went on to describe a standard counterfeit money or "green goods" mail fraud scheme:

> "I have here on my desk a large number of specimen circulars and letters sent out, which have been forwarded to the Post Office Department in this city. They were sent from various bogus offices in the large cities, professing to be from agents of some enterprise or other, which are well enough upon their face, but upon examination are found to be entirely bogus. Some of them are schemes for selling counterfeit money. They send out genuine specimens of fractional currency, and say to their correspondents, 'We can sell you so much of this money for so much.' In their circulars they may, perhaps, send a genuine twenty-five or fifty cent currency note. The person receiving the circular may; not be particularly ignorant, but being somewhat greedy, he shows it to some banker or broker, who, of course, pronounces it to be good money. Thereupon, the countryman immediately sends to the address of the agent in New York, for instance, ten, fifteen or twenty dollars, with an order for so much as it may purchase. A box or package is sent to him, perhaps, which upon being opened is found to contain waste paper, sawdust, or may be bogus money. If he does not send the money by mail, but sends to some one in the city to make inquiry, it turns out that there is really no such office. These people have no local habitation. The countryman who has done this finds that through his avariciousness he has been betrayed into doing a very mean thing and when caught, perhaps, does not like to make any noise about it for fear his neighbors may laugh at him. Thus, all through the country, thousands of innocent and unsophisticated people, knowing nothing about the way of these City thieves and robbers, are continually fleeced and robbed and mails are made

use of for the purpose of aiding them in their nefarious design."

The dealers in green goods described above, and the patent medicine cheats, the stock swindlers, flimflam artists and other confidence men, favored the mails as a means of gulling the "innocent and unsophisticated people" of the country because the mails afforded relative anonymity and freedom from apprehension. Desirous of preventing the post office from serving as the instrument of these schemes, Congress through the mail fraud statute granted the postmaster, the public servant with the greatest means and ability of discovering such schemes, the power to foil them:

"In some cases, as in New York city, for example, the postmaster, by seeing these circulars deposited in his office, or by receiving them from country letters directed to these fictitious persons; from his own knowledge, or from knowledge he obtains from the agents of the Post Office Department, gets to learn where these persons are, what they are, and who they are. He ought, therefore, to be empowered in some way to ascertain the character of these letters, and to return the money to those who have been thus deluded into sending it."

Cong.Globe, 41st Cong., 3d Sess., 35 (1870). Representative Farnsworth's speech confirms what is obvious to many present-day commentators: "that the Statute was originally aimed at flimflam artists who use the mails to defraud the gullible." *United States v. Bronston*, 658 F.2d at 931 (Van Graafeiland, J., dissenting).

As amended in 1909, the mail fraud statute essentially criminalizes schemes or artifices with either of two purposes: "to defraud" or "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." Unlike the Courts of Appeals, the Supreme Court in *McNally* deferred to the rule of lenity in interpreting criminal statutes and found it was Congress's intent to construe these two phrases conjunctively, and apply the money-or-property requirement equally to schemes "to defraud" as well as to those schemes proscribed in the second phrase.

"Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read section 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has."

—— U.S. at ——, 107 S.Ct. at 2881.

The issue in Brian Ingber's case as to his conviction on Count Nine is whether he violated the mail fraud statute by tampering with the election process, depriving the voters of their right to honest elections. According to *McNally*, this conduct is not within the reach of § 1341 because it did not deprive any entity of anything tangible and the conviction should be overturned.

The government argues that the jury in this case issued a special verdict that validates the conviction. The Court's instructions at the trial on the election mail fraud count, tracking the indictment, permitted the jury to find that the the fraud had either one of two purposes: (1) to defraud the public of the intangible right to honest elections, or (2) to obtain "money or property,—specifically, the salary—powers and privileges of the Office of Supervisor" by false pretenses. The government argues that even after *McNally*, a conviction based on the second purpose is valid. Moreover, the government claims that the jury in this case issued a special verdict that the scheme as proved had the purpose of obtaining money in the form of the salary of Town Supervisor.

The Ingber jury was instructed to reach a general verdict. However, when the verdict was taken at trial, juror number one first answered "undecided," then "not guilty," then "guilty." The jury was polled and unanimously pronounced Ingber guilty. The Court, with consent of both counsel, then conducted the following exchange:

THE COURT: ... I would like to be sure there is no confusion.

JUROR NUMBER 1: Yes, we started to break it down by issues. And as you recall, the first part you said there were

two parts to it. And we either had to have the first or the second. So the first one, we did not agree on, but the second one we did agree on.

THE COURT: And the second one was that the purpose of the scheme was to acquire the office? Is that what the second one was?

JUROR NUMBER 1: Right.

THE COURT: Now, with that clarification, are all of you jurors in agreement as to what the foreperson has said?

THE JURORS: Yes.

THE COURT: Is the jury's verdict unanimous?

THE JURORS: Yes.

THE COURT: All right, the record will indicate that you all so advised the Court, and the Court will direct that the verdict be recorded as rendered as a verdict of guilty.

Trial Transcript, at 764.

The Court's purpose in polling the jury was to confirm the unanimity of the jury's verdict. Failure to do so could have provided grounds for reversal. *See Rogers v. United States*, 422 U.S. 35, 38, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1974); *Cook v. United States*, 379 F.2d 966, 970–71 (5th Cir.1967). That juror number one elaborated on the jury's deliberations was an unintended result of the Court's inquiry and did not transform the general verdict requested of the jury into a specific finding that obtaining money or property was the object of the election mail fraud scheme. Indeed, in the factual context of this case, the scheme to get the salary and perquisites of office was essentially the same thing as the scheme to defraud the public of its right to a fair election.

■ The usual form of verdict in a criminal case is a general verdict. Special verdicts are not expressly authorized by the Federal Rules of Criminal Procedure and are disfavored. *United States v. Adcock*, 447 F.2d 1337, 1339 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 278, 30 L.Ed.2d 252 (1971); *United States v. Wilson*, 629 F.2d 439, 444 (6th Cir.1980). Where, as here, a special verdict was not contemplated by the Court or the parties,

the jury was not instructed to deliberate on and issue any specific findings, and no written findings were made, mere colloquy of counsel directed toward eliminating confusion should not be allowed to substitute for the careful procedures required to elicit the unusual result of a special verdict. *See United States v. Ruggiero*, 726 F.2d 913, 928 (2d Cir.) (Newman, J., concurring in relevant part and dissenting in part), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). Hence, doubt exists as to whether the conviction was predicated upon permissible or impermissible grounds. That doubt must be resolved in Ingber's favor and the conviction overturned. *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *see also United States v. Orozco-Prada*, 732 F.2d 1076, 1083 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); *United States v. Ruggiero*, 726 F.2d at 921.

■ Even if the foreperson's statements were deemed a special verdict on the issue of the purpose of the election mail fraud scheme, the Court concludes that payment of the Supervisor's salary, a routine and budgeted Town expenditure, to Ingber rather than to his opponent Rosenshein does not constitute a loss of money or property as contemplated by *McNally* and the mail fraud statute. The Supreme Court's discussion in *McNally* is instructive:

"It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance. [Defendants] received part of the commissions but those commissions were not the Commonwealth's money. Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent. Indeed, the premium for insurance would have been paid to *some* agency, and what [defendants] did was to assert control that the Commonwealth might not otherwise have made over the commissions paid by the insurance company to its agent."

— U.S. at ——, 107 S.Ct. at 2882 (emphasis added). Similarly, the Indictment in Ingber's case did not allege, and the jury was not required to find, that in the absence of the election tampering, the Town of Fallsburg would not have incurred the expense of the Supervisor's salary. Rather, the salary of the office of Town Supervisor would have been paid to *some* victorious candidate, regardless of Ingber's attempt to control the outcome of the election. As in *McNally*, such an expenditure does not constitute a deprivation of money or property.

*Count Five*

With respect to Count Five of the Indictment, the Court finds no merit in Ingber's argument that his conviction rested solely on a fiduciary breach or violation of the intangible right to good government. Count Five charged Ingber with using the mails as part of a scheme to misrepresent to the Town and others his interest in co-defendant Service Scaffold, Inc. (Service Scaffold), for the purpose of obtaining tangible benefits for Service Scaffold, a contractor for the sewer project. On this count, as opposed to Count Nine, the Court has the benefit of its findings of fact, pursuant to F.R.Cr.P. 23(c), in determining whether the government proved an intended deprivation of money or property. Although the Indictment alleged that this mail fraud scheme had the dual purpose of obtaining "thousands of dollars in cash and property" and defrauding the Town and other government agencies "of the honest and faithful services of Brian Ingber as Supervisor," the Court found Ingber's misrepresentations and fraud to be related directly to the purpose of obtaining tangible financial benefits for Service Scaffold.

As detailed in the Findings and Conclusions of June 18, 1986, the Government proved at trial beyond a reasonable doubt that Brian Ingber used his position as Town Supervisor to gain favorable treatment of co-defendant Service Scaffold, a corporation owned by his father and brother and for which he served as Secretary-Treasurer. The evidence established that, in violation of written assurances given to the Town, the New York State Department of Environmental Conversation (DEC) and the United States Environmental Protection Agency (EPA), Ingber concealed and exploited conflicts of interest arising out of his position as the Town's Manager of the sewer project with which Service Scaffold contracted. The Government proved, among other things, that Ingber had issued his personal guaranty to secure a surety bond Service Scaffold needed to receive this sewer contract and others, and had arranged for contract progress payments to Service Scaffold to be accelerated and issued without the normal review process, to the measurable financial detriment of the Town and to the financial benefit of Service Scaffold. Ingber was found guilty of "knowing and willful participation in ... early and excessive payments to Service Scaffold." Findings and Conclusions, at 34.

■ The Court further found that "[i]f ... the DEC had known of Brian Ingber's role in the 'procurement preparation or performance' of [the sewer contract] it would have been improper to have authorized the award of [the sewer contract] to Service Scaffold." Memorandum and Order, July 22, 1986, at 4. As a result of Ingber's conduct, the Town sustained a loss of approximately $31,000, which amount, in addition to interest, Service Scaffold and Brian Ingber are required to refund the Town as restitution. This money, along with the profit on the sewer contract and including the benefit of the "fast payments" made to Service Scaffold, constitute tangible property obtained by means of mail fraud and satisfy the money or property requirement applicable to mail fraud prosecutions. *Compare McNally*, —— U.S. at ——, 107 S.Ct. at 2881. Unlike the victims of the *McNally* defendants' alleged mail fraud, the Town here suffered a quantifiable, tangible loss, that may properly sustain a mail fraud conviction.

*Retroactivity*

■ Finally, the Court holds that the *McNally* decision applies retroactively to vacate Ingber's sentence for the invalid

mail fraud conviction under Count Nine. A presumption of retroactivity attaches to the Supreme Court's constitutional decisions. *Robinson v. Neil*, 409 U.S. 505, 507, 93 S.Ct. 876, 877, 35 L.Ed.2d 29 (1973); *Solem v. Stumes*, 465 U.S. 638, 642 (1984). An exception to this rule was created for decisions announcing new constitutional rules of criminal procedure. *See Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967); *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966) *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). In this regard, the Supreme Court has distinguished criminal procedure decisions from decisions dealing "with the kind of conduct that cannot constitutionally be punished in the first instance." *United States v. U.S. Coin and Currency*, 401 U.S. 715, 723, 91 S.Ct. 1041, 1045, 28 L.Ed.2d 434 (1971). Only the former have ever been found nonretroactive. Decisions holding a particular type of conduct constitutionally immune from punishment provide the occasion "for the invocation of a rule of complete retroactivity." *Id.* at 724, 91 S.Ct at 1046. *See also Mackey v. United States*, 401 U.S. 667, 692, 91 S.Ct. 1160, 1163, 28 L.Ed.2d 404 (1971) (Harlan, J., dissenting) (complete retroactivity should be accorded cases that "place ... certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority").

Similarly, a rule of complete retroactivity necessarily governs the situation where a criminal statute is struck down as impermissibly vague or where a statutory interpretation is rejected as an unauthorized judicial expansion of a criminal statute. In such circumstances, all prior prosecutions relying on the improper statute or statutory interpretation are invalid because the conduct penalized is no longer and in fact never was criminal.

This conclusion follows from the Supreme Court's decision in *Robinson v. Neil*, 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973). The defendant in *Robinson* had been convicted of assault twice, once in municipal court, once in state court, arising out of the same circumstances. Subse-

quently, the Supreme Court decided in *Waller v. Florida*, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), that the Fifth Amendment's double jeopardy provision precluded recognition of the "dual sovereignty" doctrine with respect to separate state and municipal prosecutions. The defendant thereafter sought federal habeas relief on the ground that his second conviction for state offenses violated his federal constitutional guarantee against twice being placed in jeopardy for the same offense. The Court granted *Waller* full retroactive effect, distinguishing it from decisions announcing rules of criminal procedure: "[t]he guarantee against double jeopardy is significantly different from procedural guarantees held ... to have prospective effect only. While this guarantee, like the others, is a constitutional right of the criminal defendant, its practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial." 409 U.S. at 509, 93 S.Ct. at 878. The Court emphasized that the *Waller* case was not directed to "collateral purposes such as the deterrence of unlawful police conduct," but rather "was squarely directed to the prevention of the second trial's taking place at all." *Id.*

The Supreme Court in *McNally* did not state a rule of criminal procedure; rather it invalidated a specific unauthorized judicial expansion of the statutory criminal law— mail fraud prosecutions based on alleged deprivations of intangible rights. The conduct of Brian Ingber in defrauding the voters of Fallsburg of their intangible right to an honest election is simply not a federal crime under § 1341 as construed in *McNally*. By rejecting the intangible rights theory of mail fraud prosecutions, the *McNally* decision was directed squarely to the prevention of such prosecutions occurring in the first instance. Absent a federal statute criminalizing Ingber's conduct, the federal government cannot properly prosecute him for election-related fraud.

Nor can the government avail itself of the "clear break with the past" doctrine, eschewing retroactivity where "law en-

forcement authorities and ... courts have justifiably relied on a prior rule of law said to be different from that announced by the decision whose retroactivity is at issue." *Solem v. Stumes*, 465 U.S. 638, 646, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984). Under this doctrine, decisions which explicitly overrule a past Supreme Court precedent, or disapprove a practice the Court arguably had sanctioned in prior cases, or overturn a long-standing practice that the lower courts had uniformly approved, are deemed nonretroactive. *United States v. Johnson*, 457 U.S. 537, 549–51, 102 S.Ct. 2579, 2586–88, 73 L.Ed.2d 202 (1982).

The "clear break" doctrine was considerably undermined in *Griffith v. Kentucky*, — U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Subsequently, our Court of Appeals has decided to apply full retroactivity to its own decisions establishing new constitutional standards in criminal proceedings. *Roman v. Abrams*, 822 F.2d 214, 227 (2d Cir.1987). In any event, here the Supreme Court's decision in *McNally* was foreshadowed by the substantial controversy and dissatisfaction expressed over the proper interpretation of the mail fraud statute. It did not break with the past, but rather reestablished the historical limitations Congress had placed on mail fraud prosecutions. The explosion of intangible rights prosecutions in the last ten years constitutes an inconsistent blip on a century-long lifeline of mail fraud prosecutions of wicked city-dwellers who fleece their more gullible countrymen of tangible goods and property. Although it is somewhat inexplicable that the Supreme Court waited over ten years to review and ultimately reject the circuits' unfounded expansion of the mail fraud statute, the *McNally* decision did not overrule a prior decision of the Supreme Court. Nor did it break any new ground in the area of statutory interpretation. "Unjustified 'reliance' is no bar to retroactivity," especially where the government claims to have relied on a series of highly controversial decisions that themselves comprised a break with the past. *Solem*, 465 U.S. at 646, 104 S.Ct. at 1343 (also stating at note 6: "A decision that overrules much-criticized precedent may

well have been clearly foreshadowed."). The *McNally* decision is entitled to retroactive application.

The Court grants the petition under § 2255 with respect to Count Nine of the Indictment, vacating the sentence imposed thereunder, and denies it with respect to Count Five. The request to reargue defendant's Rule 35 motion is denied. An amended judgment has been filed.

So Ordered.