18-2750 (L)
*United States of America v. Napout et. ano*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2019

(Argued: November 7, 2019      Decided: June 22, 2020)

Docket Nos. 18-2750 (L), 18-2820 (Con)

_____

UNITED STATES OF AMERICA,
*Appellee*,

v.

JUAN ÁNGEL NAPOUT, JOSÉ MARIA MARIN,
*Defendants-Appellants*.[1]

_____

Before:      SACK, HALL, AND BIANCO, *Circuit Judges*.

Defendants-appellants Juan Ángel Napout and José Maria Marin, former

officials of the global soccer organization Fédération Internationale de Football

Association ("FIFA"), were each convicted of, *inter alia*, multiple counts of

conspiracy to commit honest services wire fraud after a trial in the United States

District Court for the Eastern District of New York (Pamela K. Chen, *Judge*). On

appeal from the judgments of conviction, Napout and Marin argue principally that

their convictions rest upon impermissible extraterritorial applications of the

_____

[1] The Clerk of Court is respectfully directed to amend the official caption as listed above.

1

honest services wire fraud statute, 18 U.S.C. § 1346. They argue also that § 1346 is unconstitutionally vague as applied to them. We conclude that the appellants' convictions involve domestic applications of § 1346 that are sufficiently clear under the circumstances. Accordingly, the judgments of the district court are

AFFIRMED.

JUDGE HALL filed a concurring opinion.

WILLIAM R. STEIN (Marc A. Weinstein, Nicolas Swerdloff, Hughes Hubbard & Reed LLP, *on the brief*), New York, NY, *for Defendant-Appellant Juan Ángel Napout*;

CHARLES A. STILLMAN (James A. Mitchell, Bradley R. Gershel, Ballard Spahr LLP, *on the brief*), New York, NY, *for Defendant-Appellant José Maria Marin*;

SAMUEL P. NITZE, Assistant United States Attorney (Kevin M. Trowel, M. Kristin Mace, Keith D. Edelman, Kaitlin T. Farrell, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York.

SACK, *Circuit Judge*:

## INTRODUCTION

Defendants-appellants Juan Ángel Napout and José Maria Marin, former officials of the global soccer organization Fédération Internationale de Football

Association, or "FIFA" (pronounced *fee*-fa), were each convicted of, *inter alia*, multiple counts of conspiracy to commit honest services wire fraud after a trial in the United States District Court for the Eastern District of New York (Pamela K. Chen, *Judge*). On appeal from the judgments of conviction, Napout and Marin argue principally that their convictions rest upon impermissible extraterritorial applications of the honest services wire fraud statute, 18 U.S.C. § 1346. They argue also that § 1346 is unconstitutionally vague as applied to them.

Because appellants Marin and Napout appeal their convictions following a jury trial, we recount the facts viewing the evidence adduced in the district court in "'the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor.'" *United States v. Rosemond*, 841 F.3d 95, 99–100 (2d Cir. 2016) (quotation and citation omitted). But we note that in the introduction to his brief on this appeal, appellant Napout[2] declares:

---

[2] In addition to adopting Napout's brief to the extent it is applicable to him, Marin Br. at 3, n.2, Marin objects on appeal to: (1) the district court's use of an anonymous and partially sequestered jury; (2) its ruling in limine, later reversed, as to the admissibility of foreign law; and (3) the admissibility of certain expert testimony. Conversely, Napout adopts Marin's brief to the extent applicable to him as well. Napout Br. at 19, n.8. For this reason, we consider the arguments made by the two appellants as having been made by both, even when not adopted explicitly in their individual briefs.

This case raises one overarching question: by what authority does the United States purport to police the relationship between a Paraguayan employee and his Paraguayan employer, and an alleged scheme involving South Americans that took place almost entirely in South America. The answer: there is no such authority.

Napout Br. at 1. Thus Napout makes clear the central theme of the appellants' argument on appeal: Even if they did as the government alleged, and the jury so found, as a matter of American statutory and constitutional law, they were not guilty of the crimes for which they were charged.

* * *

Most Americans (and some others) refer to what we understand to be "association football" as "soccer." In most of the rest of the world, of course, it is called simply "football" (spelled "fútbol" in Spanish).[3] By any name, it is the

_____

[3] The "word 'soccer' comes from the use of the term 'association football' in Britain and goes back 200 years. . . . One variant of the game [that was played with one's hands] became 'rugby football.' Another variant [which was played with one's feet] came to be known as 'association football' after the Football Association formed to promote the game in 1863, 15 years after the rules were made at Cambridge. 'Rugby football' became ruggle' for short. 'Association football' became 'soccer.'" Tony Manfred, *The Real Reason We Call It 'Soccer' Is All England's Fault*, BUSINESS INSIDER AUSTRALIA (June 14, 2014, 9:15 AM), *https://www.businessinsider.com.au/why-americans-call-it-soccer-2014-6*. It may be worth noting, in the context of this appeal, that the term "association football" is included in the name of one of the two continent-wide associations involved in this prosecution, CONCACAF: the "North American Confederation of North, Central American and Caribbean Association Football."

world's most popular sport.[4]  Known in some quarters as the "Beautiful Game,"[5] much of the activity surrounding organized soccer, including in particular efforts to profit from the game's largest tournaments, has created widespread opportunities for corruption.  The major, largely successful criminal prosecutions that included those in the case here on appeal reflect the fact that those opportunities are sometimes taken advantage of by people associated with the sport.

These allegations of corruption have been associated with the operation of soccer's Zurich, Switzerland-based international governing body, FIFA, and some of its regional affiliates in North, Central, and South America, particularly la Confederación Sudamericana de Fútbol ("CONMEBOL"), and the Confederation

---

[4] "[S]occer [] is the most popular sport in the world.  It is estimated that more than half of the world's population consider themselves to be association football (soccer) fans. The sport enjoys an estimated 4.0 billion person following." Benjamin Elisha Sawe, *The Most Popular Sports in the World*, WORLDATLAS, https://www.worldatlas.com/articles/what-are-the-most-popular-sports-in-the-world.html (last updated Apr. 5, 2018).

[5] *See* Edson Arantes do Nascimento ("Pelé"), *My Life and the Beautiful Game* (1977). "Pelé, byname of Edson Arantes do Nascimento, (born October 23, 1940, Três Corações, Brazil), [a] Brazilian football (soccer) player, in his time [was] probably the most famous and possibly the best-paid athlete in the world." *Pelé*, ENCYCLOPEDIA BRITANNICA (Feb. 6, 2020), *https://www.britannica.com/ biography/Pele-Brazilian-athlete.*

of North, Central America and Caribbean Association Football ("CONCACAF"). Specifically at issue in this case are the bribes and kickbacks paid in connection with the process by which FIFA and its regional associates sell broadcasting and marketing rights to their more popular tournaments. Beginning at least as early as the 1980s, FIFA officials, including leaders of CONMEBOL, CONCACAF, and other such continental and national associations, accepted many millions of dollars in bribes from sports media and marketing companies in return for their granting those companies broadcasting and marketing rights to tournaments under the leaders' control.

In May 2015, after nearly five years of investigation by, *inter alia*, the United States Internal Revenue Service (the "IRS"), the United States Federal Bureau of Investigation (the "FBI"), and the United States Attorneys' Office for the Eastern District of New York, the latter secured indictments against nine FIFA officials and five executives from sports marketing and media companies, for, among other things, racketeering conspiracy, wire fraud and wire fraud conspiracy, and money laundering and money laundering conspiracy, arising out of alleged bribery schemes connected to FIFA's tournaments. *United States v. Webb et al.*, No. 15-cr-

00252 (E.D.N.Y. May 20, 2015), ECF No. 1, App. at 42.[6] Some six months later, in November 2015, the government filed a superseding indictment charging all but three of the original defendants, along with sixteen additional FIFA officials, with similar crimes arising out of the same schemes. *United States v. Webb et al.*, No. 15-cr-00252 (E.D.N.Y. Nov. 20, 2015), ECF No. 102, App. at 48–49.[7]

In June 2017, after most of the charged defendants had pleaded guilty, some of them having cooperated with prosecutors and investigators, the government filed a second superseding indictment including as named defendants just three officials of South American regional and national organizations: Manuel Burga, the former president of Peru's national soccer federation; Juan Ángel Napout, the former president of Paraguay's national soccer federation; and José Maria Marin,

---

[6] The entry refers to the indictments of Jeffrey Webb, Eduardo Li, Julio Rocha, Costas Takkas, Jack Warner, Eugenio Figueredo, Rafael Esquivel, José Maria Marin, Nicolas Leoz, Alejandro Burzaco, Aaron Davidson, Hugo Jinkis, Mariano Jinkis, and José Margulies.

[7] The entry refers to the indictments of Eduardo Li, Julio Rocha, Costas Takkas, Eugenio Figueredo, Rafael Esquivel, **José Maria Marin**, Nicolas Leoz, Aaron Davidson, Hugo Jinkis, Mariano Jinkis, Alfredo Hawit, Ariel Alvarado, Rafael Callejas, Brayan Jimenez, Rafael Salguero, Hector Trujillo, Reynaldo Vasquez, **Juan Ángel Napout**, Manuel Burga, Carlos Chavez, Luis Chiriboga, Marco Polo Del Nero, Eduardo Deluca, José Luis Meiszner, Romer Osuna, and Ricardo Teixeira. (Appellants' names in bold type).

a former head of the Brazilian national soccer federation. The second superseding indictment alleged one count of racketeering conspiracy against Burga; one count of racketeering conspiracy, two counts of wire fraud conspiracy, and two counts of money laundering conspiracy against Napout; and one count of racketeering conspiracy, three counts of wire fraud conspiracy, and three counts of money laundering conspiracy against Marin.

Burga, Napout, and Marin all proceeded to trial in the district court beginning on November 6, 2017. On December 22, 2017, after six weeks of trial and five days of jury deliberations, the jury returned its verdicts. Burga was acquitted of the one count against him; Napout was convicted of the racketeering conspiracy and wire fraud conspiracy counts but acquitted on the money laundering conspiracy counts; and Marin was convicted on all counts but one, a money laundering conspiracy count on which he was acquitted.

On August 22, 2018, the district court sentenced Marin to 48 months' imprisonment and two years' supervised release. A week later, the court sentenced Napout to 108 months' imprisonment and two years' supervised release.

On appeal, Marin and Napout challenge their convictions for honest services wire fraud conspiracy on two principal grounds. First, they contend that the honest services wire fraud statute criminalizes only fraudulent conduct that occurs on U.S. — not foreign — soil and therefore cannot support convictions based on conduct, such as theirs, that occurred overseas. Second, they argue that it is unclear whether the honest services wire fraud statute criminalizes a breach of the fiduciary duty that a foreign employee owes to his foreign employer, and therefore that the lack of clarity leaves the statute unconstitutionally vague as applied to them.

For the reasons set forth below, we conclude that these and the appellants' other arguments on appeal are without merit. We therefore affirm the judgments of the district court.

## BACKGROUND

### I. World Soccer/Football: General Background

The Fédération Internationale de Football Association (popularly known and hereinafter referred to as "FIFA") is a Zurich, Switzerland-based entity responsible for governing the sport of what Americans call "soccer." Test. of Stephanie Maennl, Trial Tr. at 106. Two hundred eleven associations world-wide,

each governing some part of the game in a particular region, country, or territory, are members of FIFA. *Id.*

FIFA's member associations are grouped into six continental confederations covering, *inter alia*, all continents except (of course) Antarctica. *Id.* at 110. "The Confederation of North, Central American and Caribbean Association Football," or "CONCACAF," referred to above, consists of 35 national associations; the South American confederation, also referred to above, including an association from every country on that continent save for Suriname and Guyana, is known as "la Confederación Sudamericana de Fútbol," or "CONMEBOL." *Id.* at 110–13.

FIFA and its members are governed by sets of rules called codes of ethics. *Id.* at 138. As relevant here, FIFA's lengthy and detailed code of ethics provides that the organization's officials "have a fiduciary duty to FIFA, the [continental] confederations, [and the national] associations." FIFA Code of Ethics (2012 ed.), Art. 15. In a section entitled "[b]ribery and corruption," the code provides that FIFA officials "must not offer, promise, give or accept any personal or undue pecuniary or other advantage . . . for the execution or omission of an act that is related to their official activities and is contrary to their duties or falls within their discretion." *Id.*, Art. 21.

CONMEBOL's code of ethics is modeled on FIFA's and also requires the confederation's officials to act with "absolute loyalty, particularly to CONMEBOL [and] FIFA[.]" CONMEBOL Code of Ethics (2013 ed.), Art. 15. The code also provides that CONMEBOL officials "may not offer or promise or give or accept any improper personal or economic benefit or any other type of benefit, in order to obtain or maintain a transaction or any other dishonest benefit with respect to any CONMEBOL person or person outside CONMEBOL." *Id.*, Art. 21.

One of FIFA and the confederations' principal functions is to promote soccer by organizing international competitions. The most prominent is the World Cup, a quadrennial tournament among the leading national teams of the six continental confederations. Since its inception in 1930, with the World War II exceptions of 1942 and 1946, it has taken place in various locations around the globe.[8]

CONMEBOL also holds tournaments the first of which preceded the first World Cup. Since 1916,[9] the confederation has organized the Copa América, a

---

[8] *See* Sean Braswell, *How Brazil Saved The World Cup In The Aftermath Of World War II*, NPR (June 11, 2014, 7:07 AM), *https://www.npr.org/sections/parallels/2014/06/11/320727176/how-brazil-saved-the-world-cup-in-the-aftermath-of-world-war-ii*.

[9] "To celebrate the centenary of its independence on 9 July 1816 . . . , Argentina organized a tournament of 2 to 17 July 1916 with Chile, Uruguay and Brazil. This Campeonato Sudamericano of Selecciones (South American Championship of

quadrennial event now held in non-World Cup years in which national teams from each of CONMEBOL's ten countries, in addition to two national teams invited from outside the region, compete to be crowned champion of South America.  Test. of Stefan Szymanski, Trial Tr. at 168, 183–84.

CONMEBOL also hosts an annual tournament called the Copa Libertadores among the most successful local club teams in South America.  Club teams qualify for the Copa Libertadores either by finishing above a specified level in the standings of their country's premier league or by winning their country's annual club tournament.  In Brazil, for example, five clubs secure bids to the Copa Libertadores each year:  the top four finishers in the country's premier league, the Campeonato Brasileiro Série A; and the winner of the annual Copa do Brasil tournament, organized by Brazil's national soccer organization, the Confederação Brasileira de Futebol ("CBF").

These tournaments are immensely popular.  For example, according to FIFA, approximately 3.57 billion people — more than half of the world's population over the age of four — watched some part of the 2018 World Cup.  *More*

_____

Nations) is the first edition of what is now known as the 'Copa América.'" *History of the Birth to the Creation of the Football Copa America*, FOOTBALL-EN.FOOTFOREVER.COM, *http://football-en.footforever.com/CA/Divers_CA/historique_div_ca.php* (last visited May 18, 2020).

*Than Half the World Watched Record-Breaking 2018 World Cup*, FIFA.com (Dec. 21, 2018), *www.fifa.com/worldcup/news/more-than-half-the-world-watched-record-breaking-2018-world-cup*.  This popularity creates fertile ground for business.

Between 2011 and 2014, FIFA generated approximately $5.718 billion in revenue, largely from sums paid by television broadcasting companies for the right to broadcast the organization's tournaments.  Test. of Stephanie Maennl, Trial Tr. at 133–34.  In 2014 alone, for example, FIFA generated nearly $743 million in revenue from the sale of television broadcasting rights.  *Id.*

FIFA also generates hundreds of millions of dollars in annual revenue by selling "marketing" rights connected with its tournaments.  They include, among other things, the right to advertise on stadium billboards and team jerseys; the right to sponsor tournaments; and the right to license images, names, and other forms of intellectual property related to tournaments.

To facilitate the sale of both broadcasting and marketing rights, FIFA and the confederations frequently hire sports media and marketing companies to serve as intermediaries between them and the various entities that wish to purchase the rights in order to exercise them.  Test. of Stefan Szymanksi, Trial Tr. at 184–85.  The companies, which specialize in selling rights connected to soccer tournaments, are

able to obtain higher prices for the rights than would FIFA or the confederations acting on their own. *Id.* at 185–86.

To select among competing sports media and marketing companies, FIFA and the confederations typically rely on a tender process whereby companies submit bids to the soccer organizations arguing why they would be best suited to serve as an intermediary in a particular circumstance. *Id.* at 187.

## II. Alleged Corrupt Practices.

### A. The Parties.

Beginning at least as early as the 1980s and continuing through the mid-2010s, the process for selling both broadcasting and marketing rights to many of FIFA's tournaments became rife with corruption, as reflected in part by the successful prosecutions in the district court of persons associated with the organization. Officials of FIFA, CONCACAF, and CONMEBOL, including the leaders of many of the related national associations, accepted millions of dollars in bribes from sports media and marketing companies in return for arranging for those companies to receive broadcasting and marketing rights in connection with tournaments under the leaders' control.

In particular, according to the indictments in the case at bar, three South American companies routinely undertook schemes to bribe CONMEBOL officials in return for the officials awarding them exclusive broadcasting and marketing rights to CONMEBOL tournaments. The indictment identifies the companies as Torneos y Competencias S.A. ("Torneos"), an Argentinian media business that operates television stations throughout Latin America, United *States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. Nov. 20, 2015), Second Superseding Indictment (the "S.S.I."), ECF No. 604 at 13, ¶ 33; Traffic Group ("Traffic"), a multi-national sports marketing company headquartered in São Paulo, Brazil, *id.* at 14, ¶ 37; and Full Play Group S.A. ("Full Play"), a sports marketing company headquartered in Buenos Aires, Argentina, *id.* at 17-18, ¶ 47.

### B.    The Schemes

1.    **The Copa América Scheme.** The largest corrupt scheme was related to the Copa América tournaments. Between 1987 and 2010, Traffic had an agreement with CONMEBOL for the exclusive broadcasting and marketing rights to the Copa América. *Id.* at 33–34, ¶ 90. In order to secure that agreement, and to maintain its relationship with CONMEBOL thereafter, Traffic paid bribes to

various CONMEBOL officials, including the confederation's president, Nicolas Leoz. *Id.*

In 2010, CONMEBOL ended its relationship with Traffic. *Id.* at 34, ¶ 91. Sometime that year, Full Play, led by its controlling principals, father-and-son Hugo and Mariano Jinkis, began negotiating with CONMEBOL to take over as the exclusive rights holder for the Copa América tournament. Test. of Luis Bedoya, Trial Tr. at 1581. As part of the negotiations, Mariano Jinkis offered bribes of $1 million to the presidents of the smaller national associations of Bolivia, Colombia, Ecuador, Paraguay, Peru, and Venezuela, who had formed a coalition — known as the "Group of Six" — to attempt to wrest power within CONMEBOL from the historically dominant nations of Argentina, Brazil, and Uruguay. S.S.I. at 13, ¶ 33, App. at 204. At that time, appellant Juan Ángel Napout was the president of the Paraguayan national association, the Asociación Paraguaya de Fútbol ("APF"), and the later-acquitted Manuel Burga was the president of the Peruvian national association, the Federación Peruana de Fútbol ("FPF"). *Id.* at 33–34, ¶ 90, App. at 203–04.

Apparently as a result of Jinkis's offer of bribes, in June 2010, CONMEBOL entered into an agreement to provide Full Play with the exclusive broadcasting

and marketing rights to the 2015, 2019, and 2023 editions of the Copa América. *Id.* at 34, ¶ 91; Text of Translation of Agency Agreement Between CONMEBOL and Full Play Group, S.A. (June 8, 2010), App. at 809–19.

In the following year, 2011, Traffic filed a lawsuit in Florida state court against CONMEBOL and Full Play alleging that their 2010 agreement had violated CONMEBOL's contract with Traffic. S.S.I. at 34, ¶ 92. To resolve the suit, Traffic and Full Play agreed to form, with Torneos, a joint-venture named Datisa Incorporated, of which each company would own a one third interest. Test. of Alejandro Burzaco, Trial Tr. at 416, App. at 441.

CONMEBOL and Full Play then terminated their contract, and in May 2013, CONMEBOL, Datisa, and Full Play reached an agreement providing Datisa with the exclusive rights to the 2015, 2019, and 2023 editions of the Copa América. Purchase Contract Among CONMEBOL, Datista and Full Play (May 25, 2013), App. at 860. The agreement also gave Datisa exclusive rights to a special centennial edition of the Copa América scheduled to be played in 2016 in stadiums across the United States. *Id.* In exchange for the rights, Datisa agreed to pay CONMEBOL $80 million for each edition of the tournament. *Id.* Datisa also agreed to pay bribes ranging from $1–$3 million for each edition of the

17

tournament, in addition to a bonus payment of $1–$3 million, to the presidents of each of CONMEBOL's national associations except for Uruguay, an expansion from Traffic's practice of bribing only the presidents in the Group of Six. Test. of Alejandro Burzaco, Trial Tr. at 418–20, Gov't App. at 149. The bribes Datisa gave to the leadership of the Brazilian association, the CBF, were complicated by the fact that the association's former president, Ricardo Teixeira, had resigned from his position in the spring of 2012 after learning he was under criminal investigation for corruption in Switzerland and Brazil. Following Teixeira's resignation, Datisa began splitting their bribes to the CBF between appellant Marin, a former politician from São Paulo who had replaced Teixeira as CBF president, and Marco Polo Del Nero, who had replaced Teixeira on a FIFA leadership committee.[10] Test. of Alejandro Burzaco, Trial Tr. at 352–53, 419; *see also* Test. of Eladio Rodrigues, Trial Tr. at 2363.

Like other CONMEBOL officials, Marin worked with Full Play, Traffic, and Torneos to keep his bribe payments secret. The money destined for him would frequently be deposited in a Swiss bank account of a Torneos-controlled shell company. Test. of IRS Special Agent Berryman, Trial Tr. 3430–40, App. at 594–95;

---

[10] Upon Teixeira's resignation, Marin and Del Nero arranged for Del Nero to succeed Marin as CBF president in 2015.

Transcript of Recorded Conversation Among José Hawilla, Hugo Jinkis, Mariano Jinkis, and Marin at 21–22, (April 30, 2014), Gov't App. at 534–35. The money would be sent from the Swiss bank to an Andorran bank account controlled by Marin's associate, Wagner Abrahao. *Id.* Abrahao would then send installments from another of his Andorran bank accounts to a Morgan Stanley bank account in New York that Marin had opened in 2012 under the name "Firelli International Limited," a shell company he owned and controlled for his own benefit. *Id.*

2. **The Copa Libertadores Scheme.** CONMEBOL's Copa Libertadores tournament was similarly subjected to bribery. Starting at least as early as 2006, Torneos paid annual bribes to CONMEBOL officials in exchange for the officials providing a Torneos affiliate, T&T Sports Marketing Ltd., with exclusive rights to broadcast Copa Libertadores matches on television. Test. of Alejandro Burzaco, Trial Tr. at 252, 295. In the scheme's earliest years, according to Torneos's Chief Executive Officer Alejandro Burzaco, annual bribes of $600,000 were paid to Leoz and five other CONMEBOL officials, including Teixeira. *Id.* In March 2008, CONMEBOL extended T&T's contract and sold to the company broadcasting rights to the 2014 through 2018 editions of the tournament. *Id.* at 310–11. Burzaco continued to pay bribes of between $500,000 and $1 million to the same six

CONMEBOL officials. *Id.* at 313–14. In 2010, Burzaco began paying annual bribes to, in addition to the six officials, the Group of Six presidents. *Id.* at 339.[11] Two years later in December 2012, after a vote by the organization's leadership, CONMEBOL extended T&T's contract through 2022. Agreement Between CONMEBOL and Torneos (Dec. 20, 2012), App. at 771–78. Burzaco continued to pay CONMEBOL officials, including the appellants Napout, and Marin, annual bribes of between $300,000 and $1.2 million. Test. of Alejandro Burzaco, Trial Tr. at 329–30, 339, 574.

### 3. The Copa do Brasil Scheme

There were also bribes paid in connection with CONMEBOL's domestic soccer tournaments. For example, between 1990 and 2009, Traffic, through its owner José Hawilla, paid yearly bribes to Teixeira to obtain a series of contracts for the broadcasting and marketing rights for the Copa do Brasil. S.S.I. at 43, ¶ 116. The last of these, executed in 2009, provided Traffic with those rights to the 2009 through 2014 editions of the Copa do Brasil. *Id.* at 43–44, ¶ 117.

In 2011, Klefer Produções e Promoções Ltda. ("Klefer"), a sports-marketing company, made payments to Teixeira to induce him to enter into an agreement

---

[11] Burzaco began splitting Teixeira's bribe payment between Marin and Del Nero when Teixeira resigned in 2012, as Datisa had for the Copa América. *Id.* at 353.

with Klefer on behalf of CBF. Under the agreement, CBF provided Klefer with the rights for the 2015 through 2022 editions of CBF's Copa do Brasil. *Id.* at 45, ¶ 118; *see also* Test. of Jose Schettino, Trial Tr. at 2573–77.

In 2012, Traffic and Klefer agreed to pool the marketing rights for the 2013 through 2022 editions of the Copa do Brasil; they also agreed to share the cost of the bribe payments to be made to CBF officials. S.S.I. at 45, ¶ 118. When Teixeira resigned from the CBF in 2012, Traffic and Klefer began paying annual bribes of 500,000 Brazilian Reais (approximately $211,864) to both Marin and Del Nero, like Datisa and Torneos had done in connection with the international tournaments. Trans. of Conversation Among José Hawilla, Kleber Fonseca de Souza Leite, and Maria Regina (April 2, 2014) at 4–6, Gov't App. at 559–61.

### 4. The Paraguayan World Cup Qualifying Scheme

CONMEBOL officials also solicited and received bribes in return for broadcasting and marketing rights for the "qualifying" matches to be played by various CONMEBOL national teams in the run up to the 2014 and 2018 World Cups. In Paraguay, for example, during October 2011, the APF agreed to sell the rights to its national team's 2014 and 2018 qualifying matches to Ciffart Sports S.A.

("Ciffart"), an intermediary for Full Play. Test. of Santiago Peña,[12] Trial Tr. at 1167–71, Gov't App. at 123–27. In order to obtain these rights, Full Play agreed to pay Napout, then-president of the APF, bribes of $1 million for the matches related to the 2014 tournament and $1.5 million for those related to the 2018 tournament. *Id.* at 1172–73, Gov't App. at 128–29, 400 (the "Peña Ledger").

Like Marin, Napout arranged to receive payments discreetly, or — as he referred to it— in a "safe way." Test. of Luis Bedoya, Trial Tr. at 1584. To keep Napout's involvement in the schemes from public view, Full Play would typically wire money from a United States bank account held in the name of a Seychelles company to an unrelated third party selected by a "cambista" (money changer); the third party would then deliver American cash to a "safety box" in Full Play's office, and Mariano Jinkis would then personally deliver the cash to Napout in Buenos Aires, usually meeting him in the Hilton hotel there. Test. of Santiago Peña, Trial Tr. at 1160–64, Gov't App. at 116–20. On occasion, Full Play also bribed Napout with concert tickets and a luxury vacation apartment in Punta del Este,

---

[12] Santiago Peña, a cooperating witness described by Marin as a co-conspirator, Marin Br. at 12, had been an employee of Full Play, Test. of Santiago Peña, Trial Tr. at 1047. As explained by the government in its brief, "At trial, the government introduced a secret ledger of bribes paid to various soccer officials that was maintained by Full Play's financial manager, Santiago Peña." Gov't. Br. at 10.

Uruguay, portions of which were also paid for by money wired from a United States bank. *Id.* at 1158–59, Gov't App. at 114–15.

## C. **Indictments and Arrests**

In May 2015, a grand jury in the United States District Court for the Eastern District of New York handed down an indictment charging nine CONCACAF and CONMEBOL officials, including Marin, and five executives from sports marketing and media companies, with, among other things, racketeering conspiracy, wire fraud and wire fraud conspiracy, and money laundering and money laundering conspiracy. *United States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. May 20, 2015), ECF No. 1, App. at 42. The charges in the 47-count indictment arose out of the bribery schemes connected to the tournaments in violation of various laws of the United States. On May 27, 2015, Marin was arrested by Swiss authorities while he was in Zurich for FIFA-related meetings. *United States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. Aug. 6, 2018), Letter in Support of CONMEBOL's Request for Restitution, ECF No. 968 at 6, App. at 1541. By the time of his arrest, Marin had

received more than $3 million in payments in connection with the Copa América, Copa Libertadores, and Copa do Brasil schemes.[13]

Napout, who by that time had begun serving as CONMEBOL's president, was not named in the original, May 2015, indictment. In the weeks following the filing of that indictment, he undertook efforts to hide the evidence of his involvement. *United States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. Oct. 17, 2017), Sealed Memo. & Order Granting Gov't Mot. for Partially Anonymous and Semi-Sequestered Jury, ECF No. 717. He hired an attorney to represent him in his personal capacity and instructed the attorney to hire another attorney — whom Napout had selected — to represent CONMEBOL. *Id.* at 3. Soon thereafter, Napout learned that he was a target of the U.S. government's ongoing investigation and instructed his personal attorney to enter into a common-interest agreement with CONMEBOL's attorney in an effort to shield Napout from criminal liability by controlling the material that CONMEBOL would turn over to the government. *Id.* at 7–8.

---

[13] *See, e.g.*, *United States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. Sept. 11, 2018), Judgment, ECF No. 1015 at 8, Gov't Special App. at 16 (ordering forfeiture in the amount of $3,335,593).

On November 3, 2015, after five months of incarceration in Switzerland, Marin was extradited to the United States and released here on bond. On November 25, the government filed a superseding indictment charging all but three of the original defendants, along with sixteen additional officials of CONCACAF and CONMEBOL, including Burga and Napout, with participating in the racketeering, money laundering and wire fraud conspiracies. *United States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. Nov. 25, 2015), Sealed Indictment of, *inter alia*, José Maria Marin, Juan Ángel Napout, and Manuel Burga, ECF No. 102, App. at 48–49.

On December 3, 2015, Napout was arrested also while in Zurich for FIFA-related meetings. By that time, Napout had, like Marin, received more than $3 million in bribes in connection with the Copa América, Copa Libertadores, and Paraguayan World Cup qualifying matches.[14] Later that day, the CONMEBOL attorney who had been hired by Napout after the first group of officials were arrested in May, entered Napout's CONMEBOL office, and, acting pursuant to Napout's instructions, removed a computer that Napout knew contained material

---

[14] *See, e.g., United States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. Sept. 4, 2018), Judgment, ECF No. 1008 at 8, Gov't Special App. at 8 (ordering forfeiture in the amount of $3,347,025.88); *see also* Gov't App. at 400 (Peña Ledger listing payments made to Napout).

relevant to the government's investigation, including evidence of Napout's relationship with defendants charged in the original indictment and evidence that he had accepted bribes. *United States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. June 22, 2018), Memorandum & Order Regarding Post-Trial Motions, ECF No. 952 at 28–29, Special App. at 88–92. Several weeks after his arrest, Napout was extradited to the United States by Swiss authorities and, upon arrival, released on bond.

A year and a half later, on June 14, 2017, after most of the defendants charged in the superseding indictment pleaded guilty to the charges, some of them having cooperated with prosecutors and investigators, the government filed a second superseding indictment naming only three defendants: Burga, Marin, and Napout. S.S.I., App. at 170–227. This second superseding indictment contained seven counts:

1. Count One charged Burga, Marin, and Napout with racketeering conspiracy in violation of 18 U.S.C. § 1961(1) and (5).

2. Count Two charged Marin and Napout with honest services wire fraud conspiracy arising out of the Copa Libertadores tournament, in violation of 18 U.S.C. § 1349.

3. Count Three charged Marin and Napout with money

26

laundering conspiracy arising out of the Copa Libertadores tournament, in violation of 18 U.S.C. § 1956(h).

4. Count Four charged Marin with honest services wire fraud conspiracy arising out of the Copa do Brasil tournament, in violation of 18 U.S.C. § 1349.

5. Count Five charged Marin with money laundering conspiracy arising out of the Copa do Brasil tournament, in violation of 18 U.S.C. § 1956(h).

6. Count Six charged Marin and Napout with honest services wire fraud conspiracy arising out of the Copa América tournament, in violation of 18 U.S.C. § 1349.

7. Count Seven charged Marin and Napout with money laundering conspiracy arising out of the Copa América tournament, in violation of 18 U.S.C. § 1956(h).

## D. Trial

Napout, Marin, and Burga proceeded to trial before a partially anonymous and sequestered jury[15] beginning on November 6, 2017. After six weeks of trial and five days of deliberations, on December 22, 2017, the jury returned its verdict. Burga was acquitted of the only count against him; Napout was convicted on the racketeering conspiracy and wire fraud conspiracy counts but acquitted of the

---

[15] The jurors' names were made available to the parties and their attorneys but were concealed from the public. The jurors were sequestered insofar as they were escorted into and out of the courthouse by U.S. Marshals and were transported from the courthouse to a central location each day before returning home. They were also sequestered during breaks in the trial, including lunchtime.

money laundering conspiracy counts; and Marin was convicted on all counts except for one count of money laundering conspiracy.

On August 22, 2018, the court sentenced Marin to 48 months' imprisonment and two years' supervised release, and ordered him to pay a fine of $1.2 million and approximately $3.34 million in forfeiture. On August 29, the court sentenced Napout to 108 months' imprisonment and two years' supervised release; the court also ordered Napout to pay a fine of $1 million and approximately $3.35 million in forfeiture. Both Marin and Napout appeal.

## DISCUSSION

### A.     Extraterritoriality

On appeal, the appellants principally contend that their convictions for conspiracy to commit honest services wire fraud were based upon impermissible extraterritorial applications of the wire fraud conspiracy statute. We review such questions of statutory interpretation *de novo*. *See, e.g., United States v. Epskamp*, 832 F.3d 154, 160–62 (2d Cir. 2016).

As a general matter, statutes are presumed to "have only domestic application." *RJR Nabisco, Inc. v. European Cmty*, 136 S. Ct. 2090, 2100 (2016) (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)). But a presumption

28

is no more than that. To analyze issues of extraterritoriality in light of this presumption, we must apply a "two-step framework." *Id.* at 2101.

At step one, we ask "whether the presumption . . . has been rebutted" by the statute in question, *i.e.*, "whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* With respect to the case at bar, we neither have been pointed to, nor have we ourselves found, any such clear, affirmative statutory indication of extraterritoriality with respect to the statute at issue here.

We therefore turn to step two of the inquiry to "determine whether the case involves a domestic application of the statute." *Id.* We begin this process by "looking to the statute's 'focus.'" *Id.* "The focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protect' or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) (brackets omitted) (quoting *Morrison*, 561 U.S. at 267). "'If the conduct [at issue] relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application' of the statute, 'even if other conduct occurred abroad.' . . . But if the relevant conduct occurred in another country, 'then the case involves an impermissible

29

extraterritorial application regardless of any other conduct that occurred in U.S. territory.'" *Id.* (internal citation omitted) (quoting *RJR Nabisco*, 136 S. Ct. at 2101).

Appellants were convicted of conspiracy to commit honest services wire fraud, not the substantive offense of wire fraud itself. A conviction for honest services wire fraud conspiracy arises from the interaction of three statutes: wire fraud, under 18 U.S.C. § 1343, augmented by the honest services fraud statute, 18 U.S.C. § 1346, and the wire fraud conspiracy statute, 18 U.S.C. § 1349. The relevant portions of those statutes provide in full:

> Whoever, having devised or intending to devise *any scheme or artifice to defraud*, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, *transmits or causes to be transmitted by means of wire*, radio, or television communication *in interstate or foreign commerce*, any writings, signs, signals, pictures, or sounds *for the purpose of executing such scheme or artifice*, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343 (emphases added).

> For the purposes of this chapter [in particular, for present purposes, § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346.

> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed

for the offense, the commission of which was the object of the attempt or conspiracy.

18 U.S.C. § 1349.

"'[G]enerally, the extraterritorial reach of an ancillary offense [such as] . . . conspiracy is coterminous with that of the underlying criminal statute.'" *United States v. Hoskins*, 902 F.3d 69, 96 (2d Cir. 2018) (quoting *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013)). Neither the appellants nor the government dispute that the statute underlying the appellants' honest services wire fraud conspiracy convictions is the wire fraud statute, 18 U.S.C. § 1343. For the step-two analysis, therefore, we must determine the focus of § 1343.

It is here that the parties join issue. In simplest terms, the appellants contend that § 1343's focus is a "scheme . . . to defraud" and that their scheme was principally foreign, while the government contends that the statute's focus is the "use of the wires" within, from, or to the United States "in furtherance of a scheme to defraud."

After briefing in this case was complete, we answered this question, albeit in the context of civil RICO rather than criminal wire fraud. In *Bascuñán v. Elsaca*, 927 F.3d 108 (2d Cir. 2019), we made clear that the conduct regulated by § 1343 – that is, the statute's "focus" – was "not merely a 'scheme to defraud,' but more

precisely *the use of the . . . wires in furtherance of a scheme to defraud*." *Id.* at 122 (emphasis in original). We also explained, however, that in order for incidental domestic wire transmissions not to haul essentially foreign allegedly fraudulent behavior into American courts, "the use of the . . . wires must be essential, rather than merely incidental, to the scheme to defraud." *Id.* This ensures that the domestic tail not wag, as it were, the foreign dog.

After this Court decided *Bascuñán*, the appellants filed a Rule 28(j)[16] letter seeking to distinguish that case from this one. They contended that whatever the general rule might be, in cases such as this one involving convictions for honest services wire fraud, "the statute's focus for [the] extraterritoriality analysis" is not the use of the wires but rather the "bad-faith breach of a fiduciary duty owed to the scheme's victim." Appellants' Rule 28(j) Letter, October 18, 2019, at 1.

We disagree. The argument mischaracterizes the nature of honest services wire fraud. It is not something different from wire fraud; it is a type of wire fraud that is explicitly prohibited by that statute. The statute includes a provision specific to honest services wire fraud not because it is in some essential aspect

---

[16] Fed. R. Civ. P. 28(j) provides in relevant part: "If pertinent and significant authorities come to a party's attention after the party's brief has been filed—or after oral argument but before decision—a party may promptly [so] advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations."

different from other wire fraud, but to clarify the application of the law of wire fraud to honest services fraud.

Federal courts began to recognize this theory of fraud based on private employer-employee relationships in the 1940s. *See Skilling v. United States*, 561 U.S. 358, 400 (2010). "In perhaps the earliest application of the theory," *id.* at 401, a district court in Massachusetts explained:

> When one tampers with th[e] [employer-employee relationship] for the purpose of causing the employee to breach his duty [to his employer] he in effect is defrauding the employer of a lawful right. The actual deception that is practised [sic] is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests.

*United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942). Thereafter, "'an increasing number of courts' recognized that 'a recreant employee' . . . . 'could be prosecuted . . . if he breached his allegiance to his employer by accepting bribes or kickbacks in the course of his employment.'" *Skilling*, 561 U.S. at 401 (brackets omitted) (quoting *United States v. McNeive*, 536 F.2d 1245, 1249 (8th Cir. 1976)). "[B]y 1982, all Courts of Appeals had embraced the honest services theory of fraud. . . . " *Id.*

But then, "[i]n 1987," the Supreme Court "stopped the development of the intangible-rights doctrine in its tracks" with its decision in *McNally v. United States*,

483 U.S. 350 (1987). *Id*. In *McNally*, the Court read the mail fraud statute (generally parallel to the wire fraud statute for present purposes) "as limited in scope to the protection of property rights." *McNally*, 483 U.S. at 360. "If Congress desires to go further," the Court said, "it must speak more clearly." *Id.*

Congress did as it was bade; the following year, it enacted 18 U.S.C. § 1346, a new "honest services statute" that provided: "For the purposes of th[e] chapter [of the United States Code that prohibits, *inter alia*, mail fraud, § 1341, and wire fraud, § 1343], the term 'scheme or artifice to defraud' *includes* a scheme or artifice to deprive another of the intangible right of honest services.'" *Skilling*, 460 U.S. at 402 (brackets in original; emphasis added) (quoting 18 U.S.C. § 1346).

On this point, therefore, the law is clear: Honest services wire fraud is "include[d]" as a type of wire fraud prohibited under § 1343. 18 U.S.C. § 1346. The fact that the appellants were convicted of honest services wire fraud thus has no bearing on our extraterritoriality analysis; it is § 1343, not § 1346, whose "focus" we must "look to" in step two of the analysis. And for our answer we need look no further than *Bascuñán* and the words of the statute itself: The focus of § 1343 is "*the use of the . . . wires in furtherance of a scheme to defraud*." *Bascuñán*, 927 F.3d at 122 (emphasis in original).

We therefore must do here as *RJR Nabisco* requires: determine whether "the conduct relevant to the statute's focus" – that is, the use of the wires in furtherance of the schemes to defraud – "occurred in the United States." *RJR Nabisco*, 136 S. Ct. at 2101. To affirm, we must also conclude that the "use of the . . . wires" was "essential, rather than merely incidental, to [the appellants'] scheme to defraud." *Bascuñán*, 927 F.3d at 122.

As to the first question, at trial, the government presented ample evidence that the appellants had used American wire facilities and financial institutions to carry out their fraudulent schemes. The government established, *inter alia*, that Marin frequently received bribe payments from the sports media and marketing companies in his "Firelli International Limited" account with Morgan Stanley bank in New York. Marin also used a debit card connected with the "Firelli" account to make purchases of, among other things, $50,000 of jewelry, and $10,000 of clothing at stores in the United States. The government similarly established that Napout was often bribed with American banknotes from U.S. bank accounts that had been wired to a cambista (money changer) in Argentina, delivered to Full Play's safety deposit box, and then given to Napout by hand. Napout was also bribed with luxury items including, for example, concert tickets and the use of a vacation

35

house, which, wherever located, were paid for with money wired from a U.S. bank account. These connections between the events in the United States and the wire transactions at issue are roughly parallel to those alleged in the *Bascuñán* civil complaint that survived a motion to dismiss. *See Bascuñán*, 927 F.3d at 112–15.

The same evidence provides the answer to the question as to the centrality of the domestic use of wire transfers to the alleged foreign scheme. At the time of their arrests in 2015, the appellants had each received approximately $3.3 million in bribes; at least $2.4 million of Marin's payments had been sent to his New York bank account, Test. of IRS Agent Berryman Trial Tr. at 3483–86, App. at 596–601, while $2.5 million of Napout's $3.3 million had been paid in cash in U.S. dollars generated by wire transfers originating in the United States, Peña Ledger, Gov't App. at 400. The use of wires in the United States therefore was integral to the transmission of the bribes in issue to the appellants. It was in return for the bribes that Marin and Napout (and their co-conspirators) gave the sports media and marketing companies exclusive rights to various CONMEBOL tournaments under their control. The transmission, then, was central to the alleged schemes. And U.S. wires provided a — or the — key means of paying those bribes. In other

36

words, in the relatively straightforward *quid pro quo* transactions underlying these schemes, the *quid* was provided through the use of U.S. wires.

## B.    <u>Vagueness</u>

The appellants next contend that § 1346 is unconstitutionally vague as applied to them.

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337–38 (2d Cir. 2016) (quoting *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013) (internal quotation marks omitted)). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Id.* at 338 (quoting *Rosen*, 716 F.3d at 699 (internal quotation marks omitted)). "Under the 'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" *Id.* (quoting *Rosen*, 716 F.3d at 699 (internal quotation marks omitted)).

Recognizing that a "violation of a fiduciary duty," is an "element of honest services fraud," *Id.* at 337, the appellants contend, in essence, that § 1346 did not

provide them with "fair notice" that the fiduciary duty they, as foreign employees, owed to their foreign employers, FIFA and CONMEBOL, could qualify as a "*source of the fiduciary obligation*," *Skilling*, 561 U.S. at 417 (Scalia, *J.*, concurring in the judgment), whose breach, if committed by a fraudulent scheme using American wires, would constitute honest services wire fraud.

Before reaching the merits of the appellants' argument, we must consider what standard of review to apply. The parties dispute this point. The appellants allege that Napout twice raised this vagueness challenge to the district court, and thus urge us to review their argument *de novo*. The government asserts to the contrary that Napout did not raise his vagueness challenge in the district court, and contends that we must review the argument for plain error. We agree with the government.[17]

Napout alleges that he first raised the vagueness argument in the memorandum of law he filed in support of his pretrial "motion to dismiss all charges for lack of extraterritorial jurisdiction." App. at 158–69. In the relevant portion of that memorandum, Napout argued that "the allegations against [him] fall squarely within the presumption against extraterritoriality and thus, fail to

---

[17] The parties appear to agree that Marin did not raise the vagueness issue before the district court.

satisfy the first step in the *RJR Nabisco* analysis." App. at 160. This argument was not a vagueness challenge; it was an argument against the extraterritorial application of the wire fraud statute.

Second, Napout asserts that he raised a vagueness challenge in the memorandum he filed in support of his motion for acquittal pursuant to Federal Rule of Criminal Procedure 29(a). It is true, that in that memorandum, Napout quoted several judicial opinions, including Justice Scalia's concurrence in *Skilling*, that discuss the issue of vagueness as it pertains to the source of the fiduciary obligation under § 1346. For example, the memorandum notes that in *United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014), a judge of the Southern District of New York remarked on the "difficulty" that "inheres in any attempt to describe in the abstract the 'fiduciary duty' the violation of which all honest services-wire-fraud prosecutions might require." *Id.* at 592. Yet, the memorandum raised nothing that can be understood as a vagueness challenge to Napout's conviction. Instead, it made only one argument: that because the bribes Napout received were "euphemistically" considered to be a permissible form of "personal payments" in the South American countries in which he lived and worked, his acceptance of such bribes did not "result[] in any identifiable harm to FIFA," and thus did not

"deprive FIFA of [Napout's] honest services." App. at 651–52. In other words, as the memorandum states in a footnote, the district court should have "allow[ed] [Napout] to prove to the jury that commercial bribery is not a crime in either Argentina or Paraguay, such that a reasonable person in [his] position would not believe that a technical violation of [FIFA's] codes constituted a breach of any duty owed to the organization." App. at 652 n.1. And while, in another footnote, the memorandum points out that "due process concerns may well arise if, for example 'a situation arose in which a defendant was charged with honest-services wire fraud, and the fiduciary duty that the defendant allegedly breached existed under federal law, but not under state law, or vice versa,'" App. at 656 n.6 (quoting *Smith*, 985 F. Supp. 2d at 598), the memorandum does *not* argue that such concerns exist in this case.

Thus, while these statements may use language similar to what might have been employed in a vagueness challenge — that is, language concerning what a "reasonable person" would have "believed" about the statute — they can only be understood, we think, as part of the memorandum's sole argument that Napout's acquittal was mandated by the government's failure to show that his receiving bribes breached his fiduciary duty to FIFA. Because this argument is not a

40

vagueness challenge, and because it is the only argument Napout made in connection with his Rule 29(a) motion, we conclude that Napout did not raise his vagueness challenge in his Rule 29(a) motion, that he therefore did not raise the challenge before the district court, and that we therefore must review his argument on appeal for plain error.[18]

Under plain error review, an appellant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (brackets and internal quotation marks omitted). "[R]eversal for plain error should 'be used sparingly, solely in those circumstances in which a miscarriage of justice would

---

[18] To be sure, as the appellants remind us, "appeals courts may entertain additional support that a party provides for a proposition presented below." *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 221 (2d Cir. 2006) (citing *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ('Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.')). That is not, however, what they attempt to do here.

otherwise result.'" *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)).

Our decision here is determined by application of plain error's second requirement: that "[f]or an error to be plain, it must, at a minimum, be clear under current law," which means that "[w]e typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) (internal quotation marks omitted).

There are undoubtedly "lingering ambiguities in § 1346," *Halloran*, 821 F.3d at 337 (discussing *Skilling*, 561 U.S. at 417 (Scalia, *J.*, concurring in the judgment)), including questions as to what may serve as "the *source* of the fiduciary obligation" that can sustain a conviction under the statute. *Skilling*, 561 U.S. at 417 (Scalia, *J.*, concurring in the judgment) (emphasis in original). As we have noted, the statute "provides no textual guidance about the duties whose violation will amount to a deprivation of 'honest services,'" *United States v. Coppola*, 671 F.3d 220, 235 (2d Cir. 2012), an issue that caused Justice Scalia in *Skilling* — and courts since — to wonder whether, to be actionable under § 1346, a fiduciary duty "must" arise from "positive state or federal law," or whether "merely general principles, such as the obligations

42

of loyalty and fidelity that inhere in the employment relationship" can suffice, *Skilling*, 561 U.S. at 417 (Scalia, *J.*, concurring in the judgment). Taking those concerns and running with them, the appellants argue that even assuming that they owed a fiduciary duty to FIFA and CONMEBOL under the organizations' codes of ethics, any such duty – that is, a fiduciary duty a foreign employee owes to his foreign employer through the nature of their private employment relationship rather than a duty arising from specific law – cannot form the basis of an honest services conviction.

Although not necessarily dispositive of the appellants' argument, our decision in *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc), provides possible guidance. There, three attorneys who had been convicted of honest services wire fraud raised an as-applied vagueness challenge to § 1346 that focused on the limits of the *conduct* the statute may penalize; they alleged that the statute did not clearly prohibit their having "arranged for secret gratuities to be paid to claims adjusters employed by insurance companies against whom [their] clients asserted claims." *Id.* at 127. Although we focused primarily on the issue of what conduct falls within the scope of § 1346, we also addressed the question of from what source a fiduciary duty underlying guilt under § 1346 may arise. We

concluded that the theory of honest services wire fraud applies to "an officer or employee of a private entity" *or* "a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers. . . ." *Id.* at 141-42; *see also id.* at 142, n.17.

Other courts have gone further. In *United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012) (en banc), a case closer to the one at bar than *Rybicki*, an *en banc* Ninth Circuit, citing *Rybicki*, held "that a fiduciary duty for the purposes of the Mail Fraud Statute [again parallel for present purposes to § 1346 applicable to wire fraud] is not limited to a formal 'fiduciary' relationship well-known in the law, but also extends to a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *Id.* at 724.

The appellants have pointed us to no authority directly supporting their position, nor have we found any ourselves, other than two pre-*Skilling* district court cases which they acknowledge are "not . . . directly analogous to this case," Napout Br. at 42, that suggests that the duty they owed to FIFA and CONMEBOL falls beyond the scope of § 1346. Rather, whether a foreign employee's duty to his foreign employer qualifies as an actionable element under § 1346 is a question that

44

remains unsettled, at best.  Thus, because it is not "clear under current law," *Whab*, 355 F.3d at 158, that § 1346 is unconstitutionally vague as applied to the appellants, the district court did not commit plain error in concluding that it is not.[19]

### C.    Sufficiency of the Evidence

Next, the appellants raise an argument similar to the one made by Napout in his Rule 29(a) motion in the district court:  They challenge the sufficiency of the evidence against them by alleging that the government "failed to adduce any evidence that" they owed a fiduciary duty to their employer (both CONMEBOL and FIFA) under the laws of Paraguay, the country where CONMEBOL is headquartered.  Napout Br. at 5.

Although we review a challenge to the sufficiency of the evidence *de novo, United States v. Khalil*, 857 F.3d 137, 139 (2d Cir. 2017), the challenger "bears a heavy burden," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)), and our review is "exceedingly deferential," *id* (quoting *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008)).

---

[19] The filing of the concurrence should not be construed as disagreement by the other panel members with the analysis contained therein, but rather reflects their view that the issue need not be addressed under the plain error review in which we engage.

The appellants' sufficiency argument miscasts the fiduciary duty they were convicted of breaching. The appellants were not prosecuted for breaching a fiduciary duty created by Paraguayan law— or Brazilian, Swiss or U.S. law, for that matter. The government alleged, and the jury found, that the appellants' conduct of accepting bribes had violated the fiduciary duty they owed to FIFA and CONMEBOL under the organizations' codes of ethics. In other words, the "fiduciary duty" — the legal obligation to provide "honest services" — that the appellants owed to their employer, the breach of which, accomplished by wire fraud, was the crime for which they were convicted, arose from their acceding to FIFA and CONMEBOL's rules, not the provision of the law of any state or country. And the government's evidence was easily sufficient to prove that FIFA and CONMEBOL's respective codes of ethics expressly provided that persons bound by those codes, including, *inter alia*, that "all" soccer "officials," such as Marin and Napout, had "a fiduciary duty to FIFA [and] the confederations [such as CONMEBOL]," and were required to "act with absolute loyalty" to them. App. at 1056, 1105. Accordingly, "the 'existence of a fiduciary relationship' between [the] employee[s] and [their] employer [was] 'beyond dispute.'" *United States v. Nouri*, 711 F.3d 129, 137 n.1 (2d Cir. 2013) (quoting *Skilling*, 561 U.S. at 406–07 n.41).

## D.     <u>Evidentiary Decisions</u>

### 1.     <u>Foreign Law Evidence</u>

The appellants next take issue with two of the district court's evidentiary decisions concerning foreign law.

First, they contend that the court violated Federal Rule of Evidence 403 by precluding them from introducing evidence or questioning witnesses about whether commercial bribery is lawful in Brazil and Paraguay.

"[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion [to preclude evidence pursuant to Federal Rule of Evidence 403] will be disturbed only if it is arbitrary or irrational." *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006). Thus, even if erroneous, a court's decision to preclude evidence under Rule 403 warrants reversal only if it "had a substantial and injurious effect or influence on the jury's verdict." *United States v. Spoor*, 904 F.3d 141, 153 (2d Cir. 2018) (internal quotation marks omitted).

In particular, the appellants argue — as they did to the district court — that they should have been permitted to introduce evidence that commercial bribery was legal in their home countries because that fact, in their view, reveals that they

lacked the fraudulent intent (or bad faith) necessary to have committed honest services wire fraud.

The district court considered this evidence and conducted the "conscientious balancing" called for by *Awadallah*. At the outset of its analysis, the court noted that whether the appellants had acted in bad faith turned not on whether they had acted with the intent to violate the laws of their home countries, but whether they had understood that their accepting bribes violated their duties to FIFA and CONMEBOL under the organizations' codes of ethics. Thus, evidence that commercial bribery was permitted under the laws of Brazil or Paraguay would be relevant to the question of the appellants' intent only if the jury could infer that: (1) the laws of the appellants' home countries permitted commercial bribery and the appellants "knew or believed" that to be so; and (2) the appellants "believed that their duties to FIFA and [CONMEBOL] were identical to their obligations under th[ose] foreign law[s]." *United States v. Webb et al.*, No.15-cr-00252 (E.D.N.Y. Dec. 12, 2017), Mem. & Order Regarding Motion *in Limine*, ECF No. 853 at 24, Special App. at 57. Because the appellants had not "articulated any reason to believe, let alone proffered any evidence, that they construed their duties to FIFA or [CONMEBOL] based on their understanding of their own countries'

48

criminal laws," the court determined that the second necessary inference was "so attenuated that it border[ed] on speculation" and thus that the evidence of foreign law proffered by the appellants carried "extremely low probative value." *Id.* at 25, Special App. at 58.

The district court concluded, moreover, that introduction of the foreign law evidence by the defendants presented "an obvious risk of jury nullification" in light of the "substantial risk that the jury would improperly acquit [the appellants] if it believed that commercial bribery did not violate the laws of [their] home countries." *Id*. In other words, allowing the jury to focus on the legality of the appellants' conduct in Brazil or Paraguay would risk the jury's ignoring the question it needed to answer to determine their guilt or innocence: whether their accepting bribes had violated FIFA and CONMEBOL's codes of ethics, and thus had deprived those organizations of their honest services in violation of U.S. law.

In sum, the district court decided, "the risk of prejudice and juror confusion substantially outweigh[ed] any probative value there may be to" allowing the appellants to introduce this foreign law evidence. *Id.* at 26, Special App. at 59.

The district court's conclusion in this regard was hardly "arbitrary or irrational." *Awadallah*, 436 F.3d at 131. Indeed, particularly in light of the at-

best-tangential nature of the relationship between the law of commercial bribery in Brazil and Paraguay and the U.S. law of conspiracy to commit wire fraud for the alleged violation of which the appellants were on trial, we do not think that the district court erred.

The appellants offer two other arguments that this conclusion was "arbitrary or irrational." First, they attempt to draw a parallel between their proffered foreign law evidence and the testimony of Stephanie Maennl, a government witness and FIFA lawyer whom the district court allowed to testify about FIFA's code of ethics. Marin Br. at 14–16. They argue that the relevance of Maennl's testimony, like the relevance of their foreign law evidence, required the jury to make a series of unwarranted inferential leaps. Not so: Maennl's testimony required the jury to draw only a single – and indeed modest – inference, that the appellants were aware of their obligations under the code of ethics she was describing, instead of the two inferences that were required to make the appellants' evidence probative. The appellants point to *United States v. Brandt*, 196 F.2d 653 (2d Cir. 1952), for the proposition that in a prosecution for wire fraud, "since [good faith, or the lack thereof] may be only inferentially proven, . . . no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the

50

tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have." *Id.* at 657. That instruction, however, calls for precisely the analysis that the district court performed here: As the court in substance concluded, whatever minor probative value the appellants' foreign law evidence may have had, it was "substantially outweigh[ed]" by the risk that its introduction would cause the jury to be confused or inclined to vote not guilty simply because the appellants' conduct was not illegal in their home countries. *United States v. Webb et al.*, No. 15-cr-00252 (E.D.N.Y. Dec. 12, 2017), Mem. & Order Regarding Motion *in Limine*, ECF No. 853 at 26, Special App. at 59.

For their second argument, Marin Br. at 26–29, the appellants attack what the district court described as a "caveat" to its ruling. *Id.* The court acknowledged that its justification for excluding the foreign-law evidence — *i.e.,* that it would require the jury to make two significant inferential steps — did not justify preventing the appellants from testifying that they themselves "relied on [their] belief or understanding of [their] own country's laws to determine [their] obligations to FIFA or [CONMEBOL]." *Id.* That testimony, the court concluded, would "bridge the gap between the [appellants'] belief[s] about foreign law . . . and [their] belief[s] about [their] duties to FIFA or [CONMEBOL]" and thus "would not

51

suffer from the same infirmity of attenuation . . . that render[ed] the other proffered evidence . . . inadmissible." *Id.* at 26–27, Special App. at 59–60.

The appellants insist that this ruling forced them "to choose, without good reason, between [their] Fifth Amendment right not to testify and [their] Sixth Amendment right to present a complete defense." Napout Br. at 56.

"The criminal process," however, "is replete with situations requiring the making of difficult judgments as to which course to follow." *Corbitt v. New Jersey*, 439 U.S. 212, 218 n.8 (1978) (internal quotation marks omitted). Therefore, even when a defendant has a "right . . . of constitutional dimension . . . to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *Id.* (internal quotation marks omitted). Under these circumstances, because the foreign law evidence was probative only as it pertained to the appellants' understanding of their obligations to FIFA and CONMEBOL, and because only the appellants themselves could testify as to that understanding, the district court's ruling, although it forced the appellants to make a potentially difficult choice, did not run afoul of the Constitution.

### 2. **Expert Testimony**

The appellants also argue that the district court erred by allowing the government's expert witness, Professor Stefan Szymanski, to testify about the economic impact that officials accepting bribes would have on soccer organizations such as FIFA and CONMEBOL. This testimony, they contend, was unreliable and inadmissible because Szymanski had not performed "any . . . empirical study of the evidence in this case." Marin Br. at 42.

"The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). We review a district court's decision to admit expert testimony under Federal Rule of Evidence 702 for abuse of discretion. *Id.* at 393.

Rule 702 allows a witness to testify as an expert if his or her "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; the "testimony is based on sufficient facts or data" and "is the product of reliable principles and methods"; and the witness "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]" *Nimely*, 414 F.3d at 395. In considering whether to admit expert

53

testimony under Rule 702, a district court serves a "gatekeeping role" by "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Szymanski, a professor of sports management at the University of Michigan, conducts research on the economics and business of sports. Before trial, the appellants moved to preclude Szymanski from testifying on the grounds that he had not performed "empirical analysis of actual data relating to FIFA." App. at 328. In denying the motion, the district court determined that any empirical basis, or lack thereof, would go to the weight of Szymanksi's testimony, not its admissibility.

On cross-examination, defense counsel asked Syzmanski to confirm that he had not "actually review[ed] any empirical data . . . of the actual prices or revenues that were generated by the media or marketing contracts involved in this case." App. at 393–400. Syzmanski agreed, stating that he had not analyzed the "specific financial information . . . of CONMEBOL regarding the sale of contracts" because it "was not available" and he "did not have access to it." *Id.* at 395.

On appeal, the appellants essentially raise the same argument they made to the district court: that Szymanski's testimony, which was "not based on any actual

54

data or empirical analysis," was so unreliable as to be inadmissible. Marin Br. at 44. Moreover, they allege that allowing Syzmanski to testify ran afoul of *United States v. Tin Yat Chin*, 371 F.3d 31, 40–41 (2d Cir. 2004), where we upheld a district court's decision to exclude expert testimony it viewed as insufficiently supported by data or facts. *Tin Yat Chin*, however, does not stand for the principle that a court must *always* exclude expert testimony that is less than perfectly supported by data. *See id.* at 41 (declining to impose a standard that requires exclusion of certain expert testimony). It serves only to confirm that a district court has "broad discretion" to decide "how to determine reliability" of proposed expert testimony and to reach an "ultimate conclusion" with respect to admissibility. *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).

We have recently observed along these lines that while a "trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison . . . other contentions that [an expert's] assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Restivo*, 846 F.3d at 577 (internal quotation marks and citation

omitted).  In the circumstances of this case, therefore, we cannot conclude that the district court abused its discretion by deciding that Szymanski's lack of familiarity with the facts underlying this case went to the weight and not the admissibility of his testimony.

### E.  Partial Sequestration of Jury

Finally, the appellants argue that the district court deprived them of their Fifth and Sixth Amendment rights to a fair and impartial jury by granting the government's motion for a partially anonymous and semi-sequestered jury.

"If a district court has taken reasonable precautions to protect a defendant's fundamental rights, we review its decision to empanel an anonymous jury for abuse of discretion." *United States v. Kadir*, 718 F.3d 115, 120 (2d Cir. 2013) (citing *United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994)).  A district court minimizes the prejudicial effects of an anonymous jury on the defendant by "giving the jurors 'a plausible and nonprejudicial reason for not disclosing their identities'" and by conducting a "*voir dire* designed to uncover bias." *Id*. (quoting *Thai*, 29 F.3d at 801). "[W]hen genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) (quoting *Thai*, 29 F.3d at 800).  After "taking reasonable precautions

to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected," "[a] district court may order the empaneling of an anonymous jury 'upon . . . concluding that there is strong reason to believe the jury needs protection.'" *Kadir*, 718 F.3d at 120 (quoting *Pica*, 692 F.3d at 88).

Most importantly, the district court protected the appellants' fundamental rights by ensuring that the jury was not anonymous with respect to any of the parties. While the jurors' identities were kept from the public, the appellants and their counsel (and the government, too) were provided with the names of the prospective jurors during jury selection and were free to investigate any of them for potential bias. Moreover, the court employed a jury questionnaire and permitted all parties to review the prospective jurors' answers and move to strike jurors for cause. Similarly, the court allowed the parties to conduct extensive *voir dire* before submitting their peremptory challenges. And the court instructed the empaneled jurors that the measures of partial sequestration (being transported to and from the courthouse by U.S. Marshals and being required to remain in the jury room or behind the courtroom during breaks) were "not unusual" and were "being taken to ensure [their] privacy and impartiality in light of the media and public attention this trial is likely to receive." App. at 378–79.

The district court's conclusion that there was strong reason for the jury to be kept anonymous and sequestered from the public fell well within its discretion. For one thing, as the appellants acknowledge, this case prompted a significant amount of media attention across the world, including reporting that revealed personal information about potential witnesses. In a sealed filing, the government also proffered evidence suggesting a possibility that jurors might face safety concerns if their names were revealed to the public, including evidence that potential witnesses in the case had already been subjected to severely intimidating behavior.

The appellants do not challenge any of the evidence cited by the district court in this regard. Instead, they rely on two opinions from the Southern District of New York to argue that the district court's conclusion was incorrect as a matter of law.

First, the appellants assert that a court's concern about media attention, "without more," is "insufficient to justify the impact on a defendant's trial that empaneling an anonymous jury may have." *United States v. Mostafa*, 7 F. Supp. 3d 334, 336 (S.D.N.Y. 2014) (citing *United States v. Vario*, 943 F.2d 236, 241 (2d Cir. 1991)). Even were *Mostafa* precedential for these purposes, however, it is

inapposite. The district court's decision here relied on legitimate considerations of juror safety in addition to its concerns about media attention that did not exist in that case.

Second, the appellants argue that the government could not make a "satisfactory showing of a reasonable likelihood of juror intimidation," because "[t]here [was] no evidence that [the appellants] either participated in or directed efforts to . . . intimidate witnesses." *United States v. Gambino*, 818 F. Supp. 536, 540 (S.D.N.Y. 1993). Our caselaw does not, however, require a court to find that a defendant personally intimidated or attempted to intimidate witnesses or others associated with the trial in order to empanel an anonymous jury. In *United States v. Aulicino*, 44 F.3d 1102 (2d. Cir. 1995), for example, we concluded that the district court did not err in empaneling an anonymous jury based on "evidence of potential jury tampering by [the defendant's] coconspirators . . . even in the absence of evidence that [the defendant] in particular had sought to obstruct justice." *Id*. at 1117. In a more recent summary order, we affirmed the empaneling of an anonymous jury based on "threats made to cooperating witnesses by other participants in the" defendant's conspiracy. *United States v. Vendetta*, 83 F. App'x 394, 400 (2d Cir. 2003) (summary order), *vacated on other grounds by Vondette v.*

*United States*, 543 U.S. 1108 (2005)). The court's finding, therefore, that the "threats and violence" faced by the potential witnesses "ha[d] a clear connection and [were] directed to preventing the investigation and/or prosecution of one of the crimes for which the defendants [were] on trial" adequately justified its decision to partially anonymize and sequester the jury. Sealed App. at 20.

## CONCLUSION

For the reasons set forth above, we conclude that the appellants' convictions rest upon permissible domestic applications of the wire fraud statute, 18 U.S.C. § 1343. In addition, we cannot conclude in light of case law binding on us that the district court committed plain error with respect to the issue of whether the honest services wire fraud statute, 18 U.S.C. § 1346, is unconstitutionally vague as applied to the appellants. We also conclude that the evidence presented at trial was sufficient to affirm the district court's judgment of conviction; and that the challenged evidentiary rulings of the district court were not error. We have considered the remainder of the appellants' arguments on appeal and conclude that they are without merit. We therefore AFFIRM the judgments of the district court.

HALL, *Circuit Judge*, concurring:

I fully concur with Judge Sack's opinion.  I write separately to add that even if the Defendants-Appellants had argued below that honest services wire-fraud is unconstitutionally vague because the statute, 18 U.S.C. § 1346, does not define the scope of the fiduciary duty required to prove the element of "honest services," *see* Slip Op. at 38-45, I would affirm their convictions.

As the opinion notes, "perhaps the earliest application" of an honest services fraud theory in a criminal case occurred in 1940, in *United States v. Procter & Gamble Co.*, 47 F. Supp. 676 (D. Mass. 1942). Slip Op. at 33 (quoting *Skilling v. United States*, 561 U.S. 358, 401 (2010)). In *Procter & Gamble*, the district court observed that "[t]he normal relationship of employer and employee implies that the employee will be loyal and honest in all his actions with or on behalf of his employer, and that he will not wrongfully divulge to others the confidential information, trade secrets, etc., belonging to his employer."

47 F. Supp. at 678. Although *McNally v. United States*, 483 U.S. 350 (1987), limited the government's ability to pursue honest services fraud cases, *see* Slip Op. at 34, the near immediate adoption of § 1346 after that decision has led this court to look back at pre-*McNally* case law to determine the scope of that section. *See, e.g., United States v. Rybicki*, 354 F.3d 124, 144-45 (2d Cir. 2003) (*en banc*). Prior to *McNally*, courts considered the combination of two factors—(a) the fiduciary duty inherent in an employer-employee relationship and (b) the acceptance of bribes or kickbacks in breach of that duty—to be sufficient to convict an individual of mail fraud. *See Skilling*, 561 U.S. at 401 (citing *United States v. McNeive*, 536 F.2d 1245, 1249 (8th Cir. 1976)). Thus, were we deciding the issue here, I would hold that § 1346 encompasses the duty that existed between the Defendants-Appellants and their employers, FIFA and CONMEBOL.

Although there has been some discussion of whether the source of the fiduciary duty required to be proven in an honest services

wire-fraud prosecution must arise from "positive state or federal law,"

Slip Op. at 43 (quoting *Skilling*, 561 U.S. at 417 (Scalia, *J.*, concurring)),

there was no such requirement in our pre-*McNally* understanding of

the mail fraud statute.  In *United States v. Von Barta*, 635 F.2d 999 (2d

Cir. 1980), affirming a conviction of mail fraud and discussing the

development of honest services fraud, we noted explicitly:

> Our discussion is not to be construed as holding that an employee's duty to disclose material information to his employer must be imposed by state or federal statute. Indeed, the employment relationship, by itself, may oblige an employee not to conceal, and in fact to reveal, information he has reason to believe is material to the conduct of his employer's business.

*Von Barta*, 635 F.2d at 1007; *see also United States v. Bronston*, 658 F.2d

920, 926 (2d Cir. 1981).  This understanding of the fiduciary duty

requirement, moreover, was not limited to our Circuit.  *See United*

*States v. Bush*, 522 F.2d 641, 651-52 (7th Cir. 1975) (holding that a

defendant's "duty to disclose need not be based upon the existence of

some statute prescribing such a duty"); *United States v. Brown*, 540 F.2d

3

364, 374-75 (8th Cir. 1976) (same); *see also United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980) (concluding "that depriving an employer of one's honest services and of its right to have its business conducted honestly can constitute a 'scheme to defraud'"). In sum, when the government proves that a defendant-employee has concealed information that is material to the conduct of his employer's business, it has proven the defendant has breached a fiduciary duty to his employer and has thus deprived the employer of his honest services. *See also Rybicki*, 354 F.3d at 141-42, 142 n.17; *United States v. Milovanovic*, 678 F.3d 713, 724 (9th Cir. 2012) (*en banc*); *United States v. Bryza*, 522 F.2d 414, 422 (7th Cir. 1975).

Defendants-Appellants' argument that the statute does not apply to foreign employment relationships fares no better under our more recent precedent. "At the heart of the fiduciary relationship lies reliance, and de facto control and dominance." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (alternation, quotation, and

4

citation omitted). These characteristics are obviously inherent in employer-employee relationships—including the relationships in this case. Had the argument been properly raised below, I would hold that a cognizable fiduciary duty exists here.

Defendants-Appellants, by virtue of their relationship with FIFA and CONMEBOL, had a fiduciary duty not to accept bribes or kickbacks, a duty that was explicitly laid out by the two associations' respective codes of conduct. Because, in my view, the element of honest services in § 1346 encompasses "the obligations of loyalty and fidelity that inhere in the employment relationship," *Skilling*, 561 U.S. at 417 (Scalia, *J.*, concurring), it follows that the statute is not unconstitutionally vague as applied to Defendants-Appellants.